[Crim. No. 2431.   Fourth Dist., Div. One.   Aug. 17, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DOROTHY LOUISE RUPAR, Defendant and Appellant.

John Stanton, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and A. Barry Cappello, Deputy Attorney General, for Plaintiff and Respondent.

294

BRAY, J.*—After conviction by the court (jury having been waived) of violation of Penal Code, section 459 (burglary) and sentence granting probation, defendant appeals from the judgment of conviction and sentence.

QUESTIONS PRESENTED

1. Was search of defendant's premises illegal because no *Dorado* warning was given?

2. Was force and coercion used to obtain defendant's permission to search her premises?

3. Did the court err in not requiring identity of the police informant to be disclosed?

*1. Consent*

Inasmuch as no contention is made that the evidence was insufficient to justify the court's judgment of guilt, it is unnecessary to detail the evidence at the trial except as it affects the legal questions presented. The court found defendant guilty of burglary in entering the Ivy Room Bar in the City of Vista with intent feloniously to commit theft. Prior to trial defendant moved, under section 995, to set aside the information on practically the same grounds as are urged on this appeal. The motion was denied.

On June 19, 1965, the Ivy Room Bar was burglarized. On July 7, Deputy Sheriffs Banning and Breen went to defendant's home. They had received "information through investigation" of the burglary that defendant "could possibly be a suspect." Banning and defendant were acquainted. Banning knocked at the front door. Defendant opened the wooden door but not the screen door. Through the latter door, Banning spoke, saying, "Dorothy, you know who I am. This is Deputy Breen from the sheriff's office. We'd like to come in and talk to you." Defendant opened the latch on the screen door and said, "Come on in." After entering the house, Banning asked defendant if she had any idea why they were there. She said, "No." A short discussion followed in which Banning told her that information had been received that indicated her to be "a possible suspect" in the burglary of the Ivy Room. She asked, "Why me?" and did Banning think she would do a thing like that. Banning replied, "Well, Dorothy, there's a very easy way to find out. How about letting us look around the house." Defendant hesitated. Officer Breen then said to Banning, "If she doesn't want us to look around, why don't we go back

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

outside? I'll wait outside and you can go ahead and get a search warrant."

Defendant said that her children were asleep in the bedroom and she did not want them awakened. Banning said that they wouldn't bother the children, and "From the information we have, in all probability it won't be necessary to search the bedroom." Defendant then said, "Well, go ahead and look around." Before searching, Banning told defendant she had a right to remain silent and that anything she said might be used against her. Banning could not remember whether he said to her anything about an attorney. Officer Breen testified that to the best of his recollection Banning then told her also that she had a right to counsel. Entering a "crawl hole" in the attic, they found several packages of cigars.

After discovery of the cigars, defendant's little boy came out of the bedroom and said that they had a lot of gum up there but that "mama had taken it down." The officers entered the bedroom. Breen asked Banning to look at a vacuum cleaner there. Banning looked at the cleaner, Breen started toward the door, and defendant said, "Wait a minute. I'll get you what you're looking for." Defendant led them into the kitchen, opened a small cupboard door and removed a plastic container of unpopped popcorn, handed it to Breen and said, "This came from the Ivy Room." Banning said, "What about the trophies?" She replied that she didn't know anything about trophies. Banning then said, "What about the bar towels?" Defendant said, "They're in here," went to a linen closet in the hallway and removed two hand towels. When asked "What about the terry-cloth bar towels with the red stripes," she said she did not get any of those. When asked where the rest of the towels were, she said, "They're on the clothesline." Breen went out and got them.

In the conversation that took place up to this point, defendant produced a couple of plastic bowls, saying that they also belonged to the Ivy Room. When asked about the food, jerky, sandwiches and so on, she said that they had been consumed or thrown away. Defendant said that she had taken a large amount of money out of the bar's cash register. She was asked about a piggy bank which had been on the back bar and was supposed to contain fifty or sixty dollars. Defendant said there was change in it, but definitely not a large amount.

Defendant then sent her little girl to get a neighbor. When the neighbor came, defendant asked her to call defendant's

husband, as defendant did not have a telephone. The neighbor returned, saying she was unable to reach defendant's husband. Defendant asked permission to go and call her husband.

Banning testified that after defendant returned from telephoning, he again told her of her right to remain silent, that anything she said might be used against her and of her right to counsel, asking her if she understood it and she said that she did.

Apparently defendant was not placed under arrest until she returned from telephoning her husband.

Defendant was taken to the police station where Banning gave her an "affidavit for constitutional rights," saying, "What this is is to confirm my having advised you earlier in reference to your constitutional rights. Do you understand it?" She said that she did and signed it in front of a witness. Then Banning asked her if she wanted to tell him about the burglary. She said she wanted to and then related the events of the burglary in detail. Banning asked her if she would write out a statement; she said she was upset and didn't want to write it. He then asked if she would make a statement in front of a secretary who would take it down, and would she sign it. She said "Yes." She then made a statement which was typed, given to her to read and signed by her. This statement was received in evidence. Banning testified that at the house defendant appeared nervous and scared.

Defendant testified that Banning asked if he could look around; that if she weren't guilty and there was nothing there, she had nothing to worry about. She didn't believe that she replied to his request. Then Breen said they were wasting time, that they would have to get a patrolman to come out and take her into Vista and then send a search crew out. This frightened her and she figured, "I may as well go ahead and let them" so she consented to the search, saying also, "I told Mr. Banning to be my guest." She first testified that Banning said nothing to her relative to her making statements until she got to Vista where he told her that statements could be used against her, but didn't mention anything about an attorney. However, on cross-examination she admitted that after the cigars were discovered Banning told her that anything she said could be used against her.

She admitted that Banning asked her if she knew why he was there and that he told her an informant had pointed to her as a suspect in the burglary. Banning also told her he had her fingerprints from behind the bar. When Breen said they

would send a search crew out, "I figured he had me then. . . . I may as well give in to him peacefully and let him look through the house." She never told the officers to get out of the house or that she did not want them to search it.

■ Defendant contends that the search was illegal because before asking defendant's permission to search she had not been advised of her constitutional rights, relying on *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

In *Dorado,* the court said: "Nothing that we have said, of course, should be interpreted to restrict law enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions." (P. 354.)

Although the finger of suspicion had been pointed at defendant, the matter was still in the investigatory stage when the officers went to interview defendant. In *People* v. *Mills,* 235 Cal.App.2d 662 [45 Cal.Rptr. 508], the circumstances were quite similar to those in the case at bench. Two officers, acting on information supplied to them by an informer, went to the defendant's house to conduct an investigation. On arriving there, they informed defendant that they had information that she was selling narcotics from her house. She denied the charge and consented to a search of the house. As defendant does in the instant case, the defendant there claimed that the search was invalid because of the *Dorado* rule. The court held that the officers were conducting what amounted to no more than an investigation into whether the defendant possessed narcotics; that she was not under arrest and the narcotics, which were found as a result of the search, had not been discovered. The court stated *"Dorado* has no application to the consent to a search elicited from appellant prior to her arrest." (P. 665.) In the instant case, the officers were conducting what amounted to no more than an investigation into defendant's possible connection with a burglary. Defendant was not under arrest, nor even in custody, and no evidence of such connection had been discovered. In *Ballard* v. *Superior Court,* 64 Cal.2d 159, 168-169 [49 Cal.Rptr. 302, 410 P.2d 838], the court held that under both *Escobedo* and *Dorado,* for the investigation to reach the accusatory stage, the suspect must be in custody. "At no time have we discarded custody as an essential element of the accusatory stage." (P. 169.)

The search was not illegal and hence the evidence the defendant had in her possession, articles taken in the burglary, was admissible.

Although defendant contends that the warning given was not a proper *Dorado* warning, she limits this contention to its claimed applicability to the search and apparently does not contend that the warning given by Officer Banning after the search commenced was not sufficient to prevent her statements from being inadmissible. This may be because the court could have determined, and evidently did, that before defendant made any statements relating to her possession of the articles found or to the burglary, she was fully informed of her right to remain silent, that any statements she might make could be used against her, and of her right to counsel. ▆ While Banning could not remember whether in his first warning he included her right to counsel, Breen testified that to his recollection this was included.[1] This statement would support the implied finding of the court that the right to counsel was given.

### 2. No force or coercion

▆ Defendant contends that defendant's consent to the search was the result of force and coercion, basing the contention on the suggestion of Breen that he wait outside the house and that Banning should go for a search warrant. There was no use of force or coercion in that statement. There was no threat of the officers' doing anything other than what they had a legal right to do. Defendant did not refuse to consent. She merely hesitated. When she realized they could search without her consent by legal means, namely a search warrant, she figured they "had me then" and consented to the search. ▆ "Whether in a particular case, an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all of the circumstances." (*People* v. *Mersino,* 237 Cal.App.2d 265, 273 [46 Cal.Rptr. 821].)

▆ Defendant's attitude during the entire time that the officers were at her home indicated a desire to fully cooperate with them as Officer Banning testified that she did. Thus, although she knew they were investigating the possibility of her connection with the burglary, she offered them coffee, did not refuse consent to the search, and even after being warned that any statements she made could be used against her,

---

[1] The question asked Breen on this subject was: "The first time, what did Officer Banning, to your recollection, say?" Breen replied: "To my recollection on the first time . . . that she had a right to counsel."

seemed anxious to tell about her connection with the burglary. There is no basis for defendant's contention that as in *People v. Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921], defendant's statements resulted from an illegal search.

### 3. *Failure to disclose name of informant.*

Both at the preliminary examination and at the trial, the refusal of the officers to disclose the name of the informant was upheld. Defendant contends that this was prejudicial error.

Defendant's arrest was not based upon the information received from the informant. She was not arrested until after the search to which she consented produced articles stolen from the Ivy Room, and after her admissions made after warning. No statement of the informer was placed in evidence. The only reference to the informer was Banning's statement to defendant to the effect that the finger of suspicion had been pointed at her by an informant.

The rule concerning disclosure is well expressed in *People* v. *McShann,* 50 Cal.2d 802, 808 [330 P.2d 33]: "A mere informer has a limited role. 'When such a person is truly an informant he simply points the finger of suspicion toward a person who has violated the law. He puts the wheels in motion which cause the defendant to be suspected and perhaps arrested, but he plays no part in the criminal act with which the defendant is later charged.' (*People* v. *Lawrence, supra,* 149 Cal.App.2d 435, at 450 [308 P.2d 821].) His identity is ordinarily not necessary to the defendant's case, and the privilege against disclosure properly applies. When it appears from the evidence, however, that the informer is also a material witness on the issue of guilt, his identity is relevant and may be helpful to the defendant. Nondisclosure would deprive him of a fair trial." See *People* v. *Faulkner,* 166 Cal.App.2d 446, 448 [333 P.2d 251].

In the case at bench, there is no evidence that the informer would have been a material witness at the trial. "[N]either the search nor the finding of guilt was predicated on the information claimed to have been received from the informer. The search was predicated on defendant's consent to the search of his person." (*People* v. *Faulkner, supra,* p. 448.) As said in *People* v. *Brown,* 191 Cal.App.2d 72, 77 [72 Cal.Rptr. 534]: "It does not appear that an informer was a participant or a material witness to the offense charged, nor does it appear that any informant could have given any rele-

vant testimony which would have been of any assistance to the appellant under the circumstances.''

Practically all the disclosure cases deal with the possession or sale of narcotics in which the finger of suspicion is pointed at the defendant and the narcotics are found in the search consented to by the defendant. In such cases the rule is expressed thusly: ''The law is established that it is not necessary to reveal the identity of an informer who merely points the finger of suspicion at a defendant where an arrest thereafter follows which is based solely upon observations by law enforcement officers which reasonably led them to believe a public offense was being committed in their presence. [Citations.]'' (*People* v. *Ortiz*, 208 Cal.App.2d 572, 580 [25 Cal. Rptr. 327].)

There is no reason why the rule should not equally apply where the arrest resulting from the search is not based upon an offense being committed in the presence of the officer, but is based upon the discovery in the defendant's presence of articles known to have been stolen in the burglary which the officers are investigating.

*Priestly* v. *Superior Court*, 50 Cal.2d 812 [330 P.2d 39], upon which defendant relies, is not in point. There, acting solely on the information furnished by two informers, the officers went to the defendant's apartment and on his opening the door arrested him and then made the search. The court there held that as the information supplied by the informers was the sole cause of the arrest, the defendant was entitled to have their names disclosed, saying: ''If testimony of communications from a confidential informer is necessary to establish the legality of a search, the defendant must be given a fair opportunity to rebut that testimony. He must therefore be permitted to ascertain the identity of the informer, since the legality of the officer's action depends upon the credibility of the information, not upon facts that he directly witnessed. . . .'' (P. 818.) There was no such situation in the instant case.

Nor is *Martin* v. *Superior Court*, *(Cal.App.) 51 Cal.Rptr. 567, in point. There, it was held that the names of the informers must be given the defendant because the legality of the search depended solely on the information given the officers by the informers.

Judgment affirmed.

Coughlin, Acting P. J., and Whelan, J., concurred.

---

*A hearing was granted by the Supreme Court on July 20, 1966.