[Crim. No. 20931. Second Dist., Div. Five. Aug. 15, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
OSCAR COLUMBUS WARD, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and James H. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

COLE, J.*—Oscar Columbus Ward was convicted of the first degree murder of Anthony Frank Ungaro. Defendant raises on this appeal contentions (1) that his arrest and the ensuing search were unlawful; (2) that it was prejudicial error for the court to give a "lying in wait" instruction to the jury, and (3) that the court abused its discretion in refusing a month's continuance of the trial and substituting the public defender in the place of private defense counsel.

We have concluded that defendant's contentions are without merit and we affirm the judgment.

### The Arrest, Search and Seizure

The victim was murdered by stabbing on December 16, 1970. Defendant was arrested at approximately 2 a.m. in the morning on December 26,

---

*Assigned by the Chairman of the Judicial Council.

1970. The arrest took place at his apartment. After his arrest certain items, ultimately admitted into evidence, were taken in a search of the apartment. The items recovered included a coat, a pair of gloves, a cap and a sap, all of which were introduced into evidence, together with a pocket knife (not the murder weapon), another coat and a pair of pants which the People did not introduce into evidence.

Defendant makes four arguments: *First,* that his arrest was unlawful and therefore the search could not be justified as incident to it. *Second,* that if the arrest was valid the search was too broad in its scope. *Third,* that if the arrest was valid the defendant's consent was obtained through an improper implied assertion of authority. *Fourth,* that if the consent was a freely given one, it was constitutionally invalid as incident to an unlawful arrest.

We do not consider the last point any further since we have determined that the arrest was valid.

The following facts were known to the officers at the time they made the arrest. Officer Gendreau of the Los Angeles Police Department was the chief investigating officer of the murder. Another officer had taken a written statement (with which Officer Gendreau was familiar) on Christmas night, a few hours before the arrest, from Elonya Ledbetter. She, up until a few days previously, had lived with the defendant for some period of time in a common law relationship, and was pregnant by him.

At the hearing on the 1538.5 motion, Elonya Ledbetter identified the written statement which she had given to the Los Angeles police on Christmas night, 1970. Officer Gendreau had talked with her in the police station that night. The statement is more complete than the officer's testimony as to the conversation, but they are essentially the same. In the statement Mrs. Ledbetter stated that defendant told her that "Joe" and "Ray" had offered defendant $1,000 to "mess up" their nephew, victim Ungaro. The statement claimed that Joe was a Wilmington bookmaker and that Ray was in business with him. The statement continued that on the day of the murder at about 1 o'clock defendant and Mrs. Ledbetter drove in her car to the apartment location. Defendant wore a brown cord jacket, a black hat, gray-green pants and blue glasses. He backed into a parking spot in a big garage across from the victim's apartment. Defendant told Mrs. Ledbetter to look for apartment 10 or 11; to knock on the door and ask for Ann; he wanted to know who was there; if Ann answered, Mrs. Ledbetter was to ask for Tony and if Tony answered, she was to ask for Ann. As she left the car a woman got into a car parked in front of

them and drove away (this woman turned out to be Mrs. Ungaro, the wife of the victim). Mrs. Ledbetter stated that she saw the name Ungaro on the mailbox for either apartment 10 or 11; that she went to a door, which had Christmas paper on it; that a woman in the upstairs apartment on the right saw her walking to the apartment; that she knocked on the door and that a man answered and identified himself as Mr. Ungaro in response to her question. He stated that his wife had gone downtown to Seventh Street and she (Mrs. Ledbetter) told him to tell his wife that she had been there; there was a lady at the mailbox while she talked to Ungaro.

Her statement continued that defendant walked up and passed her as she was walking away from Ungaro's door; defendant had passed the lady at the mailbox; she heard Mr. Ungaro say in an anxious voice, "Who are you?" "What is this?" She returned to the car and sat in the passenger seat. Defendant had told her that he was supposed to break Mr. Ungaro's arms or legs or mess up his face. Defendant had said he did not know the victim.

The statement went on that after a few minutes defendant came out of apartment 11, returned to the car, got in the driver's seat and put a knife and a blackjack on the seat. He told Mrs. Ledbetter to put the knife in her purse. It was in a case with blood on it. The knife was so big that it would only go half way into the purse. It was described as a 12- or 13-inch hunting-type knife. Defendant drove to the house and they went in to change their clothes. Mrs. Ledbetter had been wearing a white-blond, short, straight wig and defendant had her give it to him, telling her that he was going to cut it up. He sent her out of the house, telling her to go to her grandmother's. She returned later in the afternoon. The statement also said that defendant subsequently went to see Joe to get paid. He was afraid that Joe would have somebody shoot him. He said that if Joe killed him or hurt him she should report it to the police. Finally, insofar as relevant the statement said that defendant reported that he had only been paid $500 by Joe because the victim had been killed and they had not wanted that to happen. Defendant gave Mrs. Ledbetter a $50 bill.

Officer Gendreau's testimony at the hearing on the motion to suppress also indicated that at the time of the arrest the officer knew from a teenage boy, Jimmy Pina, that on the date prior to December 16, he and the victim's son had seen defendant sitting in the victim's car. At that time, the officer testified, Pina said that defendant had asked if Mr. Ungaro was his father and had told Pina and Mr. Ungaro's son to tell Mr. Ungaro that somebody had sent the defendant—the officer could not recall the name.

The officer also knew prior to the time of defendant's arrest that defendant was Negro and Mrs. Ledbetter was Caucasian. He further knew that a black and white couple had been seen at the apartment at approximately the time Mr. Ungaro was murdered. This information came from a lady who had been at the mailbox. He further knew, and Mrs. Ledbetter's statement said that, the door on the apartment was wrapped in Christmas paper.

It was admitted by the officers that Mrs. Ledbetter was an untested informant. ■ However, probable cause sufficient to support an arrest can be found in the corroborated testimony of such an informant. (*People v. Lara*, 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202].)

■ "No exact formula exists for determining reasonable cause and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act." (*People v. Ross*, 67 Cal.2d 64, 69-70 [60 Cal.Rptr. 254, 429 P.2d 606].)

■ Tested by these principles we hold that there was probable cause to arrest defendant. The untested informant, Mrs. Ledbetter, was, according to the evidence presented to the trial court at the time of the section 1538.5 hearing, properly corroborated by the facts that (1) an independent witness—the lady at the mailbox—had seen a black man and a white woman at the victim's door at the approximate time of the murder; (2) that the door had Christmas paper on it; and (3) that the Pina boy had seen defendant in the victim's car in the garage prior to December 16.

■ Defendant's next argument is that the search was too broad in its scope under the rules of *Chimel v. California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. It clearly was, but the People do not rely on the arrest to support the search. Rather they rely on the fact that defendant gave his consent to the search.

The consent, which is attacked by the defendant as being given because of an implied assertion of authority which did not exist, was given under the following circumstances. The officer testified that he asked for permission to search and said that if defendant did not give permission then the police would have to apply to the district attorney's office and possibly get a search warrant which would involve a wait. The defendant was in handcuffs at this time. The officer testified that defendant stated that it was all right to search the house. Defendant recognizes in his brief by quoting from *People v. Robinson*, 149 Cal.App.2d 282, 285 [308 P.2d 461], that " 'Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion

of authority, is a question of fact to be determined in the light of all the circumstances.' " He argues that a consent to search is not freely and voluntarily given when the person giving it believes that he must permit the search. He attacks the continued validity of *People* v. *Robinson, supra,* because of the intervening decision of the United States Supreme Court in *Bumper* v. *North Carolina,* 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], to the effect that a consent was invalid when it was given in submission to a law enforcement officer who represented that he had authority to enter and search a house against a defendant's will. In our case no such representation was made. In a situation more analogous to that at bench (*People* v. *Rupar,* 244 Cal.App.2d 292, 294-295 [53 Cal.Rptr. 70]), a defendant hesitated in giving consent and the officer said to his partner, " 'If she doesn't want us to look around, why don't we go back outside? I'll wait outside and you can go ahead and get a search warrant.' " After being assured that the officers would not awake her children, defendant in that case said that the officers could go ahead and search. At this time the matter was still in its investigatory stages, the officers wanting to search for the fruits of a burglary. The court stated that there was no use of force or coercion in the officer's statement that he would wait outside the house while they secured a search warrant since this was merely a statement of what the officers had a legal right to do. We see no legal difference between that factual situation and this one.

Furthermore, the trial court found as a matter of fact that the consent was freely given and the officer's testimony, although contradicted by defendant, constitutes substantial evidence on this point. The trial court expressly rejected the defendant's testimony and accepted that of the officers. That is the trial court's function, not ours.

The search and seizure contentions are without merit.

### *Lying in Wait*

Penal Code section 189 provides in relevant part: "All murder which is perpetrated by means of a destructive device or explosive, poison, *lying in wait,* torture, or by any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree. . . ." (Italics added.)

■ The lying in wait theory is used to determine the degree of a murder once it has been established that a murder has occurred. (*People* v. *Bernard,* 28 Cal.2d 207, 211 [169 P.2d 636]; *People* v. *Thomas,* 41 Cal.2d 470, 474 [261 P.2d 1].)

■ Where lying in wait is present and the jury has determined that the killing in question amounts to murder, then questions of defendant's wilfulness, deliberation and premeditation are taken from the jury by the force of the statute. (Concurring opinion of Traynor, J., *People* v. *Thomas, supra,* at p. 478.)

If the lying in wait theory is invoked in an improper case there is a danger that a defendant may have the gravity of his crime fixed as murder in the first degree without the jury reaching the question of premeditation and deliberation. (See *People* v. *Byrd,* 42 Cal.2d 200, 217-218 [266 P.2d 505], dissenting opinion.)

Before discussing the applicability, *vel non,* of the lying in wait theory of first degree murder, we recite the facts which were presented to the jury.

Ann Ungaro, the widow of the victim, testified that the victim was a bookmaker and she assisted him in his work. Mrs. Ungaro left her apartment at approximately five minutes before 1 p.m. on the day in question. Her children had left to return to school after lunch. Mrs. Ungaro was going first to a welfare office and then to a fish store run by the victim's relatives. Her car was parked in the garage belonging to the apartment complex. Behind her car was another car. The defendant was seated behind the wheel of that car and Mrs. Ledbetter was standing outside the passenger door. Mrs. Ledbetter was wearing a very blond, platinum-white wig.

Mrs. Ungaro then left the area. At 1:25 or 1:30 she tried to call her husband from the fish market and there was no answer. She fixed the time because she had a 2 o'clock appointment at her daughter's school. She returned from the fish market to her house; the car that she had seen earlier in the garage was no longer there. When she entered the apartment she found an overturned chair and saw her husband's body. She immediately called her husband's brother and then the police.

The coroner testified at length. The cause of death was from a knife wound in the chest. The body also had superficial abrasions on the neck and discolorations of the cheek produced by some sort of traumatic force. The neck marks could have been made by gloves and were compatible with the movements of a struggling victim.

A police officer testified that the jacket, a pair of gloves and a black hat, introduced into evidence, were removed from defendant's home.

Elonya Ledbetter was called as a witness three times during the trial, twice by the prosecution and once by the defense. She told varying and

conflicting stories which materially contradicted the statement she had given to the police on December 25, 1970. That statement, recounted above, was read to the jury as was a second statement given by her on December 28, 1970, and her testimony at defendant's preliminary examination. It was also brought out that she had been given immunity by the prosecution and had earlier fled the state.[1] In her trial testimony, Mrs. Ledbetter admitted that on the date in question she and defendant went to the apartment building and parked the car in the garage. She also admitted seeing a woman get into an adjoining car and drive away. She also testified that defendant told her to go knock on the door of an apartment; that she selected apartment 11 by chance; that she asked the victim if his wife was home and he answered no, and that during her conversation with the victim, defendant approached the apartment. She then said that she and defendant returned to their car. She was wearing a white wig. She denied seeing defendant with a bloody knife. On being confronted with a picture of a knife which she had drawn at the request of the police officers during her interrogation by them, she did not recall the drawing. Her preliminary hearing testimony essentially agreed with the testimony in her statement of December 25, 1970, referred to above. The statement of December 28, 1970, also read to the jury, dealt primarily with defendant's contact with "Joe" and "Ray."

A law clerk in the district attorney's office testified that Mrs. Ledbetter said to him during the course of the trial, when he inquired as to why she was upset, that she knew she had a duty to society to tell the truth as a witness but on the other hand she felt she had a duty to the man she loved to protect him in any way that she could.

A lady who lived in the same apartment complex as the victim, testified to seeing a male Negro and a white female standing in front of the decedent's apartment at about 1:15 p.m. on the afternoon of the murder. She could not recognize either of the people.

Jimmy Pina testified as recounted above in connection with the hearing under section 1538.5. He added to that testimony that defendant upon ascertaining that the other boy present was the victim's 11-year-old son, Gary Ungaro, told Gary, "Tell him Uncle Charley sent me." Jimmy Pina identified defendant at a lineup.

Gary Ungaro testified that he saw defendant on the Sunday before his

---

[1]The instant trial was the second trial of defendant for this murder. At his first trial, some three or four months earlier, Elonya Ledbetter was a fugitive witness and her preliminary hearing testimony was read to the jury. The jury in that trial was unable to reach a verdict and a mistrial was declared.

father died, by the stairs in front of the apartment house. He did not remember what defendant said. He did remember that defendant asked if Tony Ungaro lived there. The witness told him yes.

A black detective testified, apparently as an expert on street jargon used in the black community, that the phrase, "Tell him Uncle Charley sent me" might be a threat or directive. It meant that the person giving this message holds the person that he brings the message from in endearment. The message giver works for the sender. The sender is possibly someone in power.

Another prosecution witness testified that while he was a cellmate with defendant he asked defendant why he killed somebody and defendant said that he was paid to do it.

During the defense portion of the case Mrs. Ledbetter recanted most of what she told the police, although she admitted going to the apartment on December 16, 1970.

Defendant's own testimony was one of alibi. He claimed that Mrs. Ledbetter threatened to jail him for first degree murder because he had told her he would not admit paternity of their child. Defendant admitted that he had been convicted of five previous felonies.

Rebuttal evidence consisted of testimony of a police officer that toward the end of the trial he had a conversation with Mrs. Ledbetter at her request. The conversation was tape recorded with her knowledge and consent. The tape recording was played to the jury in the presence of Mrs. Ledbetter. In it she again told essentially the story that she had given to the police on December 25, 1970, and which appeared in her preliminary hearing testimony.

We turn now to a consideration of whether a verdict based on the theory that the defendant was "lying in wait" was proper. Defendant does not directly attack the instructions[2] given on this subject insofar

---

[2]People's instruction number 3: "Murder which is perpetrated by means of laying in wait is murder of the first degree.

"To constitute lying in wait, as the term is used in these instructions a person's conduct must involve an intent to take another person unawares so as to do him bodily injury, and must include, as a means to that end, a waiting and watching for an opportune time to do the act, and also either a concealment in ambush or some other secrecy of design to take the other person by surprise.

"Lying in wait does not require any particular position of the body, or that the designing person refrain from moving about, or that he entice or trap the object of his design into any strange or puzzling situation, or that the lying in wait continue

as their content is concerned. Defendant's argument is that lying in wait requires the elements of watching, waiting, and *concealment* and that none of the three elements are present in this case.[3] Defendant asks that the judgment be modified (presumably to one of murder in the second degree). The People argue that the elements are watching, waiting and *secrecy* and that concealment is not a necessary element.

The discrepancy between the two positions is purely semantic. We do not believe that either party is correct. Concealment is an element of the "lying in wait" theory[4] and is present in this case. As was said in *People v. Atchley*, 53 Cal.2d 160, 175 [346 P.2d 764]: ■ "The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person." The confusion between the two positions stems from an improper appreciation of the nature of the "concealment" which is required for the lying in wait theory to be applicable. " 'As a general rule to constitute lying in wait to commit murder the perpetrator must be in ambush *or* concealment for the purpose of taking his victim unawares. In some cases, however, the term has been applied to facts other than a *concealment in ambush*. For instance, it has been applied where it appeared that the victim was induced by the wife of the accused to come to their home, and that the accused, who had stayed there for the purpose of killing him, did so as the victim was leaving the premises after having talked to the accused and his wife for a short time.' " (*People v. Tuthill*, 31 Cal.2d 92, 100-101 [187 P.2d 16], quoting

---

for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation.

"When the killing of a human being amounts to murder and is accomplished by lying in wait, it is murder of the first degree even though there did not exist in the mind of the slayer the specific intent to kill, but it is necessary that there be the intentional inflicting of bodily injury upon the person killed under circumstances likely to cause his death."

People's instruction number 1: "Concealment in ambush is not necessary for murder by lying in wait. The victim can be aware of the assailant. All that is required is a waiting, watching, and secrecy."

[3]It is clear that the defendant both watched and waited. Entirely apart from his apparent scouting of the premises a few days before the murder (when he was observed by the victim's son and by Jimmy Pina), on the date in question the defendant waited in the car with a knife while he sent Mrs. Ledbetter to make sure the victim was home (and presumably home alone). This satisfies the element of watchfulness as well as that of waiting.

[4]The latest Supreme Court cases to discuss lying in wait are: *People v. Harrison*, 59 Cal.2d 622 [30 Cal.Rptr. 841, 381 P.2d 665]; *People v. Rosoto*, 58 Cal.2d 304 [23 Cal.Rptr. 779, 373 P.2d 867]; *People v. Atchley*, 53 Cal.2d 160 [346 P.2d 764]; and *People v. Byrd*, 42 Cal.2d 200 [266 P.2d 505].

26 Am. Jur., p. 165, § 16;[5] italics added.) In *Tuthill,* the victim found the defendant lying asleep on a bed in her motel room. When she awakened him and asked what he was doing there, he rose up and disclosed a rifle concealed under his body. The victim stated to the defendant: "You are not going to shoot me." She then left the room, but turned back into it after leaving at which time she was shot. In this context where the victim had become aware of the physical presence of the defendant prior to the killing, the court in *Tuthill* (at p. 101) said as to the facts presented to it that "[t]he elements of waiting, watching and secrecy all were present." This language was picked up in *People* v. *Sutic,* 41 Cal.2d 483, at page 492 [261 P.2d 241], a case where a defendant with a grudge against the decedent's family fired into a home and killed a child. Forty-five minutes earlier he had been seen by the father of the victim sitting in a car near that home. Neither *Sutic, supra,* nor *Tuthill, supra,* can be taken to really read the element of concealment out of the theory of lying in wait. As we have already seen *Tuthill* itself recognizes that the element of concealment may manifest itself by either an ambush or by the creation of a situation where the victim is taken unawares even though he sees his murderer.

That this is so is also shown by the fact that four days earlier than the decision in *People* v. *Sutic,* the Supreme Court decided *People* v. *Thomas,* 41 Cal.2d 470 [261 P.2d 1]. There, while not expressly discussing the elements necessary for a finding that a defendant murdered by lying in wait the majority approved an instruction that: "The gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching and concealed from the person killed with the intention of inflicting bodily injury upon such person or of killing such person." (41 Cal.2d at p. 473.) In elaborating on the elements of lying in wait in his concurring opinion, Mr. Justice Traynor stated (at p. 480): "Lying in wait requires the elements of waiting, watching, and concealment for the purpose of taking a victim unawares." Essentially the same language was adopted by the Supreme Court in *People* v. *Harrison,* 59 Cal.2d 622, 630 [30 Cal.Rptr. 841, 381 P.2d 665] and *People* v. *Rosoto,* 58 Cal.2d 304, 355 [23 Cal.Rptr. 779, 373 P.2d 867].

It is clear that while concealment is an element necessary before lying in wait can be applied, it is only a concealment which puts the defendant in a position of advantage from which the fact finder can infer that lying in wait was part of the defendant's plan to take his victim by

---

[5]The case referred to in the quotation is *Williams* v. *State,* 130 Ala. 107 [30 So. 484].

surprise. (See *People* v. *Sutic, supra,* 41 Cal.2d 483, 492.) Such conduct is ample to show that a deliberate and premeditated murder was contemplated and to take the place of direct proof on that subject.[6]

While many lying in wait cases are of the classic ambush type situation, where a killer conceals himself in a yard or subsidiary building and fires from that position of concealment (e.g., *People* v. *Miles,* 55 Cal. 207; *People* v. *Vukich,* 201 Cal. 290 [257 P. 46]; *People* v. *Bernard, supra,* 28 Cal.2d 207; *People* v. *Atchley, supra,* 53 Cal.2d 160, 175; *People* v. *McNeal,* 160 Cal.App.2d 446 [325 P.2d 166]; *People* v. *Gibson,* 92 Cal.App.2d 55 [206 P.2d 375]) in other cases the victim was approached by the killer before the killing took place. (*People* v. *Harrison, supra; People* v. *Rosoto, supra; People* v. *Byrd, supra,* 42 Cal.2d 200.)

In *People* v. *Byrd, supra,* the defendant waited for over four hours in front of his divorced wife's home and after a visitor left, entered it, engaged in conversation with her and shot her. Lying in wait was held apt to apply.

█ That the victim was taken unawares in the present case is shown by his comments: "Who are you?" "What is this?," uttered as defendant approached the apartment door. Taken with defendant's pre-expressed intent to commit a battery upon the victim by breaking his legs or arms, the element of concealment conducted with the intention of inflicting bodily injury upon or killing the victim was amply shown.

### Removal of Counsel

Defendant's last contention is phrased as follows: "The substitution of counsel did not meet the requirements of Code of Civil Procedure section 284." This contention arose out of the following circumstances.

As indicated above, the trial under consideration was the second trial of defendant for the murder of Anthony Ungaro. The first trial resulted in the declaration of a mistrial on April 29, 1971. On that date proceedings were continued until April 30 for trial resetting. On April 30, the cause was continued to May 20, and on that date to May 24, 1971.

During the first trial, defendant was represented by a deputy public defender. On May 24, at defendant's request, the public defender was relieved and Everett E. Ricks, Jr., was substituted in as the defendant's attorney.

---

[6]The jury in the instant case was also instructed on the theory of first degree murder based on a wilful, deliberate and premeditated killing. The evidence would fully justify a finding on this theory also. (*People* v. *Sutic, supra.*)

The transcript of the proceedings on May 24 shows the following:

"Mr. Ricks: Your Honor, we would respectfully request, due to the amount of investigation and preparation I have to do on this matter, that the matter go to July—

"[Deputy District Attorney]: Well, actually, Mr. Ricks and I have spoken. Mr. Ricks indicated he wants it put over until after your return from vacation, in order to have time to prepare. I will have witness problems up until the 20th of July.

"Mr. Ricks: The 20th would be agreeable, or any time thereafter agreeable with the Court. We do want time, also, to attempt to find this girl, which I feel is crucial to our defense in this matter.

"[Deputy District Attorney]: Well, that was one of the contingencies People took into account; that everybody wants her. We want her, also. And if it's agreeable with Mr. Ward, it's certainly agreeable with the People."

After ascertaining that such a continuance was agreeable to the defendant personally the court continued the case for trial to July 20, 1971, at 9 o'clock. The clerk's transcript indicates that Mrs. Ledbetter was taken into custody on an attachment for a defaulting witness on June 29, 1971.

On July 20, 1971, the matter was trailed to July 27, 1971, on the court's own motion. Notwithstanding this latter continuance, a minute order of July 22, 1971, reads that on the court's own motion the case was trailed to July 27, 1971, "defense counsel engaged in trial." On July 27, 1971, a session was held with the defendant present. Mr. Ricks reported that he was still engaged in a matter in another department of the court, and that he hoped that the trial would conclude within three weeks but thought he should say four weeks to be safe. The district attorney adamantly insisted that because he was holding a material witness (Elonya Ledbetter) in custody, and he did not know how long she could be held, that the court not grant a continuance and that the case be placed "in a trailing status" until new counsel was found. He further suggested "that the counsel be relieved and a new counsel be appointed or that a new counsel be hired in his place." He noted that Mr. Aid, the deputy public defender who handled the first trial, was in the courtroom. Somewhat presumptuously the deputy district attorney also suggested that Mr. Ricks should sign his fee over to the County of Los Angeles.

Mr. Ricks then stated: "As I told the Court and as I have told [the deputy district attorney] here on numerous occasions, I am willing to do anything the Court desires on the matter. . . ." With respect to the fee he said that he had told both defendant and his mother that he would be

willing to return the fee to the mother. He emphasized that he had prepared this case and that he was ready to try it except for the fact that he was engaged in the other trial. The district attorney then insisted that the matter had to go to trial, stating (erroneously) that he thought it was two or three weeks that the matter had been continued already. The court indicated its knowledge that Mr. Ricks was not at fault and that the situation was entirely unanticipated, but stated that the People were being discommoded by the delay and the witness' freedom curtailed. The court then suggested that defendant ought to make arrangements with other counsel. Mr. Ricks indicated that that had been attempted but that in view of the fee arrangements no other private counsel would come in on the matter. Mr. Ricks then indicated that the defendant "wanted to be pretty selective about who he has try a first degree murder case." The court indicated that if defendant could not obtain other counsel who could assure that the trial would proceed, the public defender should be reappointed. Mr. Ricks indicated that defendant would not be able to obtain other counsel since he had no funds of his own and it was his mother who had hired Mr. Ricks.

The court said that it was therefore necessary to reappoint the public defender or have a lengthy continuance and "that is not something I believe the Court could tolerate at this time. I don't believe it would be good for Mr. Ward." Mr. Ricks then indicated that the defense desired the attendance of the witness Elonya Ledbetter also. The court turned to the deputy public defender who had previously represented defendant and who was in the courtroom. He stated he was available to undertake to represent defendant again in the retrial of the case so long as he had a reasonable amount of time to subpena witnesses. The court then stated: "I will order that Mr. Ricks be relieved; that the Public Defender be reappointed to represent Mr. Ward in this case."

Sometime later in the morning the public defender stated to the court in the presence of defendant that he would suggest the trial date as being the fourth of August (which was one week further on). The court asked the district attorney if that was satisfactory and he replied, "Not really, your Honor. We'd like it now. This week." He indicated his concern about the witness problem but recognized the public defender's need to prepare. The court, however, felt that the week until August 4 was the minimum time for preparation.

It should be noted that throughout the entire exchange on July 27, the defendant was at no time consulted nor, so far as the reporter's transcript shows, did he say anything in open court. Thus, while he did not affirma-

tively agree to the change of counsel, neither did he affirmatively object to it, and his privately hired counsel did state that "he was willing to do anything the court desires on the matter."

Section 284 of the Code of Civil Procedure provides that "the attorney in an action . . . may be changed at any time . . . as follows: 1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes; 2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other." This section is applicable to criminal as well as civil cases. (*Smith* v. *Superior Court,* 68 Cal.2d 547, 558 [68 Cal.Rptr. 1, 440 P.2d 65]; *In re Martinez,* 52 Cal.2d 808, 813 [345 P.2d 449].)

While it is error not to comply with section 284 in connection with the substitution of counsel in criminal cases (*In re Haro,* 71 Cal.2d 1021 [80 Cal.Rptr. 588, 458 P.2d 500]) such error does not always result in a deprivation of one's constitutional right to counsel or require a reversal. (*In re Martinez, supra.*)

Further, any errors in connection with section 284 can be waived. (*People* v. *Donel,* 255 Cal.App.2d 394, 401 [63 Cal.Rptr. 168] [defendant, who told the court that a certain individual was not his counsel and asked for the public defender to be substituted, held not prejudiced by the absence of a written substitution under sections 284 and 285 of the Code of Civil Procedure]; *People* v. *Prince,* 268 Cal.App.2d 398 [74 Cal.Rptr. 197].)

In *Prince* a situation similar to that at bench occurred. At the time of trial setting, private counsel asked to withdraw on the ground that he had been unable to secure the defendant's cooperation. The defendant stated that he would utilize the services of the public defender because he had no funds. In that case, as in this one, colloquy revealed that the withdrawing attorney had discussed with the defendant the prospect of his withdrawal. On appeal, in response to an objection that the provisions of section 284 of the Code of Civil Procedure had not been complied with, the court held that there was no showing that the withdrawal prejudiced either the defendant, the prosecution or the smooth course of the administration of justice. (268 Cal.App.2d at p. 406.)

Defendant stresses language originally appearing in *Smith* v. *Superior Court,* 68 Cal.2d 547, 559-562 [68 Cal.Rptr. 1, 440 P.2d 65], and emphasized in *People* v. *Coogler,* 71 Cal.2d 153, 169 [77 Cal.Rptr. 790, 454 P.2d 686], that: ". . . a trial court can only *relieve counsel* on its own motion when there is objective evidence of 'physical incapacity to

proceed with a meaningful defense of his client, such as illness, intoxication, or a nervous breakdown. . . .' " (Italics added; see also, *People* v. *Crovedi,* 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868].) We believe that reliance on that proposition is misplaced in the case at bench.

It is true that the court stated at the conclusion of the colloquy that Mr. Ricks was "relieved." Actually, the problem is more one of substitution than relief. A party may waive a right to counsel (*In re Martinez, supra,* 52 Cal.2d 808) and the fact that defendant failed to voice any objection at all to the procedure followed is not without significance. (*Smith* v. *Superior Court, supra,* at p. 562.) It remains true that "[it] is manifest that the courts cannot in every case await the convenience of some attorney before they can function. Reduced to its lowest terms this would allow a popular attorney to have the courts marking time to serve his convenience." (*People* v. *Dowell,* 204 Cal. 109, 113 [266 P. 807].) We do not mean to intimate in any way that Mr. Ricks was pursuing any calculated tactics of this sort and as indicated the fault was not at all his. He acted in the highest professional manner.

We do not know the exact circumstances under which Mrs. Ledbetter was returned from the State of Oregon, whether pursuant to the Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Cases (Pen. Code, § 1334 et seq.), or otherwise. The result of the delay because of the witness problem, which was a concern both to the People and the defendant, was felt by the court to be a matter which the court could not "tolerate"; it was an interference with the administration of justice, however innocently brought about. In this light, defendant's reliance on *People* v. *Kerfoot,* 184 Cal.App.2d 622 [7 Cal.Rptr. 674], is not appropriate. There, a whole congeries of problems gave rise to a situation whose ultimate result was that over the objection of defendants, and without any notice to them or any facts from which consent could be inferred, they were deprived entirely of the right of counsel.

If we combine the fact that defendant here, as in *People* v. *Prince, supra,* 268 Cal.App.2d 398, could not afford private counsel with the legal principle that a defendant may not, in the absence of conflict, require the appointment of an attorney other than the public defender to represent him, then, short of tolerating an additional delay in its proceedings, the court's only alternative was to substitute into the case the public defender who had previously represented the defendant.

We believe the final answer to this case is found in *People* v. *Johnson,* 5 Cal.App.3d 851, 858 [85 Cal.Rptr. 485], where the court said: "Although

there is not an *absolute* right to be represented by a particular attorney, the courts will make all *reasonable* efforts to insure that a defendant financially able to retain an attorney of his own choice can be represented by that attorney. Under certain circumstances, due process is denied to a defendant who is not granted a continuance in order to secure a private attorney of his own choosing. [Citation.] A court will not interfere with the defendant's right to be represented by counsel of his choice unless to accommodate him would result in a disruption of the ordinary process of justice to an unreasonable degree. [Citation.] Obviously, each case is to be tried on its facts and in each case there must be a determination as to whether or not the trial court abused its discretion in denying a continuance for this or other grounds."

■■■ Whatever decision we might have made initially, we cannot say that the trial court acted arbitrarily in denying an additional four weeks continuance. There was no abuse of discretion.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied September 13, 1972.