[Crim. No. 28714. Second Dist., Div. Five. Apr. 29, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER BARRY GURTENSTEIN, Defendant and Appellant.

COUNSEL

Ron Minkin for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HASTINGS, J.**—Defendant Peter Gurtenstein and codefendant Kathleen Ann Campbell[1] entered a plea of guilty to the crime of possession of barbiturates for the purpose of sale (Health & Saf. Code, § 11378, subd. (a)). Proceedings were suspended without imposition of sentence, and Gurtenstein was placed on probation for a period of three years on certain terms and conditions. Defendant Gurtenstein appeals from the judgment (order granting probation), contending (1) that the trial court erred in denying his motion for discovery and (2) that his motion to suppress evidence (Pen. Code, § 1538.5) should have been granted.

The facts adduced in connection with the section 1538.5 hearing were as follows: At about 3:15 p.m., on April 9, 1975, Frank Campbell was working at the TWA baggage service office at Logan International Airport in Boston, Massachusetts, when a man came up to the counter with a package. The man said he wanted it shipped to Los Angeles on TWA's next flight which left at 4 p.m. Campbell noticed that it was a cardboard box (about 18 inches wide and 6 to 8 inches high) covered

---

[1]Codefendant Kathleen Ann Campbell withdrew her appeal.

with wrapping paper and taped. He estimated that it weighed about 30 pounds. He also noticed that there was no addressee or sender written on the package. After Campbell informed the man this information should be supplied, he wrote, "One of a Kind" in Los Angeles as the addressee and the name of a plant company as the sender. When Campbell wrote up the airbill the man told him the package contained fabric or cloth. Campbell thought the package weighed more than one that size containing cloth would weigh. He also noted that the man appeared to be a "little nervous" and "overanxious." He kept asking if the package would get on the next flight. Campbell assured him that it would get on the aircraft without any trouble and gave him a copy of the shipping bill.

Because the man seemed so anxious about getting the package on the 4 o'clock flight and because the package felt heavier than it should, Campbell suspected that there might be a bomb in the package. Because of his suspicions, he had the package X-rayed. However, the X-ray only showed that there was something like the shape of a suitcase inside the box. Campbell thought it was unusual that the man had not mentioned that there was a suitcase inside the wrapping so he took the package back to his counter area and notified his supervisor. Thereafter, Officer Davis of the Massachusetts State Bomb Squad was notified. Campbell apprised him of the situation. Davis picked up the box and estimated that it weighed between 30 and 35 pounds. Officer Davis was also suspicious about the package, especially since Campbell was so nervous. Officer Davis had known Campbell for a long time and he had never seen him so apprehensive. His suspicion was further aroused when Campbell mentioned how the man did not originally have the names of the addressee or sender on the package. He examined the airbill which the man had signed. He could not make out a single letter in the person's signature.

On the basis of his experience as a bomb expert, the officer was aware of several types of bombs which did not require any metal in their construction and which would, therefore, not show up on an X-ray machine. Most of these bombs are constructed with a combination of chemicals and plastics. Some bombs are able to be triggered barometrically as a result of the lessening of the density of the air when the aircraft increases its altitude. Some are of the "time-delay" variety which works by the erosion of acid through rubber or plastic causing the mixing of two chemicals which starts a fire. Other than by opening the package, there is no way to determine if it contains a nonmetallic bomb.

Officer Davis opened the cardboard wrapping and saw what appeared to be a new Samsonite suitcase. After examining the cardboard wrapping and suitcase for "booby trap type devices" he slid the suitcase onto the counter. He then unlocked the combination lock and opened it up. Inside were seven transparent frozen food type bags containing tablets. The State Narcotics Unit was then notified. Six days later about 200 of the red tablets and 200 of the white tablets were sent on to Los Angeles.

On the evening of April 15, 1975, Officer Stanley of the Los Angeles administrative narcotics division obtained custody of the package at the Los Angeles International Airport. After the bags containing the tablets had been dusted with ultraviolet powder, they were repackaged and returned to the TWA baggage facility. Shortly thereafter, codefendant Kathleen Campbell picked up the package and drove to a residence in Palos Verdes Estates. Officer Stanley and several other officers followed. Upon their arrival Officer Stanley went to the rear of the house while Agent Daly and Officers Gossett and Walker walked up to the front of the house. Daly testified that there was a window in the front door, which was covered with a thin gauze curtain. After knocking he saw defendant approach the door. He then announced, "Federal Agents. You're under arrest" and defendant started running toward the rear of the house. Glass was shattered. Daly entered the house and Stanley went in through the rear door. He ran into a hallway leading into a rear bedroom and saw defendant already in custody. The package Campbell picked up at the airport was on top of the bed. He also saw on the floor a cardboard box top containing marijuana. Stanley took defendant into the bedroom and advised him that he was under arrest for possession of dangerous drugs. He advised defendant of his rights and asked him for identification. Defendant gave him a California driver's license bearing the name "Gurtenstein." He then asked defendant if he lived at the residence. Defendant replied that he was temporarily living there, that the people who owned the house were named Willis, and that they were away on vacation. Stanley looked through defendant's identification and found a real estate company's card. He telephoned the company and talked with a real estate agent who described the person who had rented the house. The description fit defendant. Defendant then admitted, "It's me. I rented the house under the name Willis." Stanley then told defendant he wanted to search the house for additional contraband and advised him that he could either apply for a search warrant or have defendant's consent to search the house; that if he applied for a search warrant it would be up to the magistrate to determine whether to issue the warrant. Defendant hesitated briefly and then said he could go ahead and "search

the closet." The officer replied that that "wasn't enough" and to complete his work he would have to have a consent to search the entire house. Defendant then stated, "Well, you've got the marijuana. Go ahead and search. You can go ahead and search the house." The officers found a brown suitcase inside the closet. Defendant said it was not his. Officer Stanley forced it open and inside, he found seven bags of red tablets resembling Seconal (secobarbital). The officers also discovered a loaded gun, $5,000 cash, and various narcotic paraphernalia.

After they were half way through searching the house, Stanley asked defendant if he would sign a written consent to search. Defendant refused to sign a written consent, however, he did not retract or withdraw his earlier verbal consent.

After the search, an ultraviolet light test revealed traces of ultraviolet powder on the hands of both Campbell and defendant.

Testifying in his own behalf, defendant stated that the first he was aware of law enforcement officers at his house was when he heard someone yell, "Federal Agents. You're under arrest." A second or two later, the officers broke through the front door, entered his house and immediately handcuffed him.

Defendant denied that Stanley advised him of his rights. He stated that Stanley told him "There's two ways we can go about [searching the premises]. We can either get your consent to search or get a search warrant. . . . It would be easier for everyone concerned if consent was given." Defendant refused to give his consent. The officer then noticed the tray of marijuana in the bedroom, and said that that gave them "[probable] cause to search." The officers then proceeded to search the residence without his consent. During their search, Stanley asked him to sign a consent to search. He refused.

On rebuttal Agent Daly stated that his entry was made about eight seconds after he announced his presence.

■ Defendant made a pretrial motion for discovery of the following information pertaining to the X-ray machine located at Boston's Logan Airport used to examine the package opened and searched by Officer Davis: (1) The name of the manufacturer, model and serial number of the machine; (2) all information and instructions regarding the standard procedures and principles in operating the machine; (3) all information,

instruction or manual instructions from the maker, the airlines or other sources to persons operating the machine; (4) all information relating to the reaction of the machine to various items and objects, including but not limited to cloth, clothing, books, and types of explosive devices; (5) a list of all types of items, materials, substances, and objects that will not register on the machine as anything other than a blank when subjected to the machine; and (6) any and all other relevant information.

Defendant contends that the trial court erred in denying this discovery motion. He argues that the information requested was material to both the issue of probable cause to search and in the cross-examination of prosecution witnesses Frank Campbell and Officer Davis. He further asserts that the information which the defense sought to discover was available to the prosecution and not otherwise available to the defense.

■ A defendant's motion to discover is addressed to the sound discretion of the trial court, which has inherent power to order discovery when the interests of justice so demand. (*Pitchess* v. *Superior Court,* 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305]; *Hill* v. *Superior Court,* 10 Cal.3d 812, 816 [112 Cal.Rptr. 257, 518 P.2d 1353].) "Allowing an accused the right to discover is based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information." (*Pitchess* v. *Superior Court, supra.*) An accused, however, is not entitled to inspect material as a matter of right without a prior showing of good cause. It must appear reasonable that knowledge of such information will assist him in preparing his defense. The court has discretion to deny discovery in the absence of a showing which furnishes a "plausible justification" for inspection. (*Hill* v. *Superior Court, supra,* at p. 817.)

■ In the present case, the evidence showed that the X-ray machine would not reveal a bomb inside a package if the bomb were the "altimeter type" where chemicals ignite or combine due to a lessening of pressure. An explosive device might be detected by an X-ray only if there were some outline revealed suggesting such a device, i.e., an item in the shape of a can, an oblong article, an alarm clock, or sticks of dynamite. When an X-ray was taken of the package in question, the machine only showed the outline of a suitcase. Campbell testified that he did not see anything suspicious when he X-rayed the package, and Davis testified that he did not X-ray the package. Thus, the information requested by defendant in his motion was not relevant nor could such information have assisted defendant in preparing his defense. Further-

more, there is nothing in the record which indicates that such information was available to the prosecution but not available to the defense. From an examination of the record of the hearing on the motion, it appears that the prosecution did not have such information, however, the defense in essence argued that it would be easier for the prosecution to obtain it and transmit it to the defense. Thus, had defendant's motion been granted, compliance would have required the prosecution to prepare the case for the defense. This is an obligation not imposed by the law. (See *People* v. *Cohen*, 12 Cal.App.3d 298, 323 [90 Cal.Rptr. 612].) The trial court did not err in denying defendant's motion for discovery.

■ Defendant contends that Officer Davis' search of the package at the Boston airport was unlawful because he possessed no information which justified his suspicion that the package contained a bomb. This contention is without merit.

Here, Officer Davis searched the package as part of a screening program designed to prevent the placement of a bomb in aircraft luggage. Contrary to defendant's assertion, the officer was justified in suspecting that the package may have contained some type of explosive device. The man who left the package was very insistent that the package go to Los Angeles on the next flight at 4 p.m., even though other flights were taking off at approximately the same time and to the same destination. Further, when he initially handed the package to Campbell, there was no name of an addressee *or* sender on the package. The signature the man placed on the airbill was illegible. Officer Davis testified that he had known Campbell for a long time and had never seen him so nervous about a piece of luggage. Campbell also told Davis that the man who left the package said the package contained fabric. However, Campbell lifted the package and thought that the package was too heavy for its size to just contain fabric. Even though the X-ray did not reveal any metallic bomb or explosive device, it was possible that the package could have contained an altimeter type bomb. Clearly, under these circumstances the officer was justified in opening the suitcase to determine if, in fact, it did contain explosives. (See *People* v. *Hyde*, 12 Cal.3d 158, 165-168 [115 Cal.Rptr. 358, 524 P.2d 830].) The exigencies of the situation obviated any necessity for obtaining a search warrant. The plane the shipper had insisted the package be shipped on was due to leave shortly after Davis opened the package. Thus, if the package had contained an explosive, it was logical to assume that it was set to explode in a short while. In any event, the package was an easily movable object and to hold it while waiting for a warrant would also constitute a seizure.

(*People* v. *Goodyear,* 54 Cal.App.3d 157, 162 [126 Cal.Rptr. 368].) As noted in *People* v. *Hyde, supra,* at page 168, "Airport searches are singularly unsuited to the warrant procedure."

Accordingly, by reason of the foregoing, we conclude that Officer Davis' search of the package was reasonable. There was substantial evidence to support the trial court's ruling that the contraband was not the product of an unlawful search and seizure.

■ Defendant also contends that the search of his residence by the police and federal narcotics agents was unlawful because (1) he did not voluntarily consent to the search, (2) he withdrew his consent prior to the completion of the search and (3) the scope of the search was unreasonable.

■ " '[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.' [Citations.] The trier of fact's resolution of this question will not be disturbed on appeal if there is substantial evidence to support it. [Citations.]" (*People* v. *Ruster,* 16 Cal.3d 690, 701 [129 Cal.Rptr. 153, 548 P.2d 353].)

■ In the present case, after advising defendant of his constitutional rights, Officer Stanley told defendant that he wanted to search his house. He advised defendant that he "could either apply for a search warrant ... [o]r [he] could have his consent to search the house." Defendant agreed to a search of the closet. The officer replied that that "wasn't enough ... that [he] would have to have a consent to search the entire house, and [he] would go down and apply for a search warrant." These statements, however, cannot be considered coercive since the officer was merely telling the defendant what he had a legal right to do. (*People* v. *Ward,* 27 Cal.App.3d 218, 224-225 [103 Cal.Rptr. 671]; *People* v. *Rupar,* 244 Cal.App.2d 292, 298 [53 Cal.Rptr. 70].) Moreover, there was no evidence that defendant's consent to search was actually motivated by the officer's statement regarding the possibility of obtaining a warrant. In fact, defendant stated at the trial that he did not give permission to the officers to search his home and that the officers proceeded to search without his consent.

Defendant further argues that his consent was not voluntary because he was not advised of his right to refuse consent. ■ However, an

advisement to defendant of his right to refuse consent to a search is not a prerequisite to establishing that defendant voluntarily consented. (*People* v. *Wheeler,* 23 Cal.App.3d 290, 305 [100 Cal.Rptr. 198]; *People* v. *Thomas,* 12 Cal.App.3d 1102, 1108-1111 [91 Cal.Rptr. 867].) Moreover, the officer told defendant that he could consent or a warrant would be sought. This was tantamount to advising defendant that he had a right to refuse consent.

■ Contrary to defendant's arguments, there is nothing in the record to indicate that the presence of "seven to eight officers" contributed to defendant giving his consent. The record shows that Officer Stanley was the only officer who spoke to defendant about a search. From the record, it cannot be said that defendant's consent to search of his residence was involuntary as a matter of law.

Defendant also claims that his refusal to sign a written consent and his declining to assist the officer in opening the suitcase found in the closet amounted to a withdrawal of his previously given consent. (7) It is true that a voluntary consent to search may be withdrawn at any time before the search is completed. (*People* v. *Martinez,* 259 Cal.App.2d Supp. 943, 945 [65 Cal.Rptr. 920].) Actions inconsistent with consent may act as a withdrawal if those actions are positive in nature. (*People* v. *Botos,* 27 Cal.App.3d 774, 779 [104 Cal.Rptr. 193].)

■ Here, defendant did nothing to indicate that he was withdrawing his consent. He merely refused to sign a written consent. He did not state he was withdrawing his oral consent. In addition, the record shows that defendant did not refuse to help the officer open the suitcase. Defendant only told the officer that the suitcase was not his. He did not refuse to let the officer open it up himself.

Citing *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], defendant contends that the search was unlawful because it exceeded the permissible scope of a search incident to his arrest, i.e., the area immediately under his control at the time of his arrest. However, the search of defendant's residence was not a search incident to his arrest. Rather, it was made pursuant to his consent (as discussed, *ante*). The search of his residence was not unlawful.

The motion to suppress under Penal Code section 1538.5 was properly denied, and the judgment (order granting probation) is affirmed.

Kaus, P. J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1977.