[Crim. No. 5087. Fourth Dist., Div. One. Sept. 15, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
SHARON GLEA BOTOS, Defendant and Appellant.

## COUNSEL

James M. Gattey, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Elaine A. Alexander and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN (Gerald), P. J.**—Defendant Sharon Glea Botos appeals her court-tried conviction of transporting marijuana (Health & Saf. Code, § 11531) and possessing marijuana for sale (Health & Saf. Code, § 11530.5).

Kent Allan Wenger came to San Diego to buy marijuana in July 1971; he stayed at Botos' home for three or four days, and on July 8 bought marijuana from a person to whom Botos had introduced him on an earlier trip. Wenger packed the marijuana in his two suitcases, putting six plastic wrapped kilo bricks in each. During the late evening of July 8 Botos drove Wenger to the San Diego airport. Wenger bought a plane ticket to Indiana, and the bags were tagged as his and loaded into the plane's baggage compartment.

The federal government's airplane hijack detection system contains a hijacker profile made up of statistical information describing specific characteristics of likely hijackers. Because Wenger met the hijacker profile, an airline ticket agent stopped him at Gate 8 before boarding his flight. The agent asked Wenger for identification, and when Wenger did not satisfy this request, the agent called Deputy U.S. Marshal Johnson, who was assigned to the anti-air piracy detail at the airport. Johnson asked Wenger to come with him to an unoccupied gate. Botos, who had gone with Wenger to the boarding gate, walked with Wenger and Johnson to Gate 6. Johnson asked Wenger for identification, and Wenger gave him a social security card and a draft classification card. Unsatisfied, Johnson asked for further identification, and Wenger said he had none, explaining he lost his wallet two months earlier. Johnson asked permission to look through Wenger's luggage for weapons, explosives, or identification. Wenger consented. When the bags were brought to the counter, Wenger said he did

not have the key to open them, and asked Botos if she had it. She answered he had it. Johnson saw a large bulge in Wenger's pocket, and asked him what it was. Wenger replied it was a roach holder, and removed it from his pocket. Three keys were attached to it. Johnson asked if one of the keys would open the luggage, and Wenger replied it would. Wenger had become increasingly nervous during these proceedings and, when Johnson asked him to open the bags, took several tries to fit the key in the lock. Finally, he unlocked and, at Johnson's request, opened a suitcase. Johnson saw the marijuana, and arrested both Wenger and Botos.

■ During the grand jury proceeding, Johnson refused to answer questions concerning the secret air hijacker profile. Botos maintains since the profile has not been revealed the detention is not justified and her motion before trial to suppress the marijuana (Pen. Code, § 1538.5) was erroneously denied.

The United States Supreme Court has summarized the Fourth Amendment protection afforded the individual against interrogatory police tactics, saying: ". . . wherever an individual may harbor a reasonable 'expectation of privacy,' . . . he is entitled to be free from unreasonable governmental intrusion. Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted." (*Terry* v. *Ohio,* 392 U.S. 1, 9 [20 L.Ed.2d 889, 899, 88 S.Ct. 1868, 1873].) ■ When a uniformed officer approaches a citizen and "requests" he accompany him, even a short distance, for questioning, there is some infringement on personal liberty. Such activity, if conducted on the street and with no objective facts to justify it, is not permissible (*People* v. *Henze,* 253 Cal.App.2d 986, 988-989 [61 Cal.Rptr. 545]). The content of the Fourth Amendment guarantee, however, must be shaped by the context in which it is asserted. Here the questioning did not take place on a street or in a park, but occurred in an airline terminal at the place where passengers were boarding the plane. ■ It is unnecessary to document the alarming increase in aircraft piracies over the last few years. The dangers presented to innocent bystanders by these crimes are apparent.[1] When these obvious dangers are combined with the inherent difficulty of preventing hijackings, an individual's expectation of privacy from questioning or search when boarding an aircraft should not be as high as in other public places (See *United States* v. *Lindsey,* 451 F.2d 701, 703). Johnson did not search Wenger for weapons, but merely questioned him concerning his identification.

---

[1]The detention, questioning, and weapons search of an individual has been held justified if he falls within the hijacker profile's suspect classification. See *United States* v. *Lopez,* 328 F.Supp. 1077, 1097.

This limited police investigation is similar to requiring an individual to pass through a magnetometer; though not permissible on the streets, it is not objectionable at the aircraft boarding ramp. Contrary to Botos' contention, the aircraft hijacker profile need not be shown to justify this limited investigation. No one may reasonably entertain an expectation his privacy will be free from this type of intrusion under these circumstances.

■ Having decided the investigative detention was "justified at its inception" (*Terry* v. *Ohio, supra,* 392 U.S. 1, 20 [20 L.Ed.2d 889, 905]), was it impermissibly broadened in time or scope? Botos argues the questioning should have terminated when Wenger supplied the two I.D. cards; also she questions the validity of the request to search the luggage. Johnson's investigation could continue until his suspicions were, or should have been, allayed (*Pendergraft* v. *Superior Court,* 15 Cal.App.3d 237, 242 [93 Cal.Rptr. 155]). Wenger's production of the two I.D. cards did not dispel all suspicion, nor should it necessarily have. The continued questioning was warranted. Johnson's request to search the luggage was justified under these circumstances, since it fell within the scope of the original investigation. If the luggage was found to lack bombs or weapons, the suspicion Wenger was an air pirate would have been greatly allayed.

■ After Johnson requested permission to conduct the luggage search, Wenger consented. Botos maintains Wenger withdrew his consent when he denied having the keys to open the bags, and later by obviously being nervous or reluctant to open them. ■ Whether the search was made following a valid consent is a question of fact (*People* v. *Munoz,* 24 Cal.App.3d 900, 904 [101 Cal.Rptr. 265]). ■ Although actions inconsistent with consent may act as a withdrawal of it, these actions, if they are to be so construed, must be positive in nature. Thus, if a suspect who has given consent to search his car's trunk throws the key in some bushes, his consent is withdrawn (*People* v. *Escollias,* 264 Cal.App.2d 16, 18 [70 Cal.Rptr. 65]). Similarly, if a search is agreed to, but the suspect later refuses to cooperate with the police, there is no consent (*People* v. *Shelton,* 60 Cal.2d 740, 745 [36 Cal.Rptr. 433, 388 P.2d 665]). ■ In this case, however, Wenger merely denied having the keys. This denial does not constitute positive action, and may not be construed as a refusal to cooperate, since Wenger voluntarily produced the key when asked about a bulge in his pocket. When Johnson requested Wenger to open the luggage, Wenger complied. Throughout the proceeding, there was no refusal to cooperate or any other action consistent with a withdrawal of consent. The finding consent was not withdrawn is supported by reasonable inferences based upon substantial evidence.

■ Botos maintains her actions, as shown by the evidence, do not support either the indictment or the conviction. ■ The grand jury indictment will not be set aside if, from the evidence presented, it could be rationally assumed a crime was possibly committed by the accused (*Jackson* v. *Superior Court,* 62 Cal.2d 521, 525 [42 Cal.Rptr. 838, 399 P.2d 374]). ■ The evidence presented to the grand jury showed what happened at the airport on the night of the arrest, and also the amount of marijuana in the luggage. From the fact Botos drove Wenger to the airport, accompanied him to the gate, and knew he had the key to the luggage, a rational assumption could be made she possibly knew what was in the bags. This knowledge alone would make her at least an accomplice to transporting and possessing (*People* v. *Valerio,* 13 Cal.App.3d 912, 921 [92 Cal.Rptr. 82]). The indictment was valid.

■ The test of the conviction on appeal is whether substantial evidence supports it (*People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]). ■ Wenger's testimony at trial supported the conclusion Botos knew what was in the luggage. She had introduced him to the seller. She was aiding in the transportation and her actual possession of the marijuana was irrelevant to the conviction for transporting it (*People* v. *Rogers,* 5 Cal.3d 129, 134 [95 Cal.Rptr. 601, 486 P.2d 129]). Botos also aided Wenger in his possessing the marijuana for sale; from this fact she could be convicted of possessing marijuana for sale even though she did not possess it herself (*People* v. *Valerio, supra,* 13 Cal.App.3d 912, 921).

Judgment affirmed.

Ault, J., and Cologne, J., concurred.