[Cite as *State v. Hale*, 2023-Ohio-980.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                      CASE NO. 10-22-01

    v.

TEDDY E. HALE,                           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Mercer County Common Pleas Court
Trial Court No. 21-CRM-008

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: March 27, 2023

APPEARANCES:

    *Chima R. Ekeh* for Appellant

    *Anthony J. Miller* for Appellee

**MILLER, P.J.**

{¶1} Defendant-appellant, Teddy E. Hale, appeals the decision of the Mercer County Court of Common Pleas denying his motion to suppress the results of blood and urine testing. Hale also attacks the evidentiary basis for his convictions for driving under a 12-point suspension, driving under a financial responsibility law suspension, and aggravated vehicular homicide. For the reasons that follow, we affirm in part and reverse in part.

## I. Facts & Procedural History

{¶2} On the afternoon of September 27, 2020, Hale was driving his 2013 Chevrolet Impala in Celina, Ohio when he slammed into the back of a 2006 Honda motorcycle driven by Yvonne Noel. Noel was ejected from her motorcycle and ultimately died as a result of the collision. Patrolman Nathan Miller of the Celina Police Department responded to the scene of the crash and established contact with Hale. Patrolman Miller collected Hale's information and relayed it to his dispatcher, who advised, "His status is suspended." (State's Trial Ex. 1). Patrolman Miller then asked Hale whether he would be willing to provide blood and urine samples for testing. Hale agreed and, sometime later, blood and urine samples were collected from Hale at a local hospital. Subsequent testing of Hale's blood and urine revealed the presence of methamphetamine, amphetamine, tramadol, and a THC metabolite.

{¶3} On January 21, 2021, the Mercer County Grand Jury returned a 14-count indictment against Hale. As relevant to this case, Hale was indicted on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a). The indictment alleged that, at the time of the offense, Hale "was driving under a suspension or cancellation imposed under Chapter 4510. or any other provision of the Revised Code," thereby elevating the aggravated-vehicular-homicide offense to a first-degree felony. In addition, Hale was charged with one count of driving under a 12-point suspension in violation of R.C. 4510.037(J), a first-degree misdemeanor, and one count of driving under a financial responsibility law ("FRA")[1] suspension or cancellation in violation of R.C. 4510.16(A), an unclassified misdemeanor. On February 3, 2021, Hale appeared for arraignment and pleaded not guilty to the counts of the indictment.

{¶4} On January 26, 2021, Hale filed a motion to suppress the results of the blood and urine testing. In support of his motion, Hale argued that the test results should be suppressed because his consent was obtained by deceptive or coercive means. Following briefing between the parties, a suppression hearing was held on May 13, 2021. On June 11, 2021, the trial court denied Hale's suppression motion. Among other things, the trial court found:

> [T]he facts establish that [Hale] voluntarily submitted to being present
> at the hospital with the officer for the purpose of submitting to the

---

[1] Although R.C. 4510.16 refers to "financial responsibility law" suspensions, suspensions of this type are customarily referred to as "financial responsibility act" or "FRA" suspensions.

blood and urine tests; that the officer used no coercive procedures in order to obtain [Hale's] consent to provide the blood and urine sample; that [Hale] was extremely cooperative with not only law enforcement, but the hospital representatives * * *; that [Hale] was completely lucid and aware of his right to refuse to consent; that [Hale] acted as an educated and intelligent person in consenting to the blood and urine draws; and that [Hale] believed that the [blood and urine samples] would provide evidence of the presence of some residual drug and alcohol content.

(Doc. No. 62). The trial court concluded that notwithstanding Hale's claims of involuntariness, "the evidence clearly establishes that the draws of blood and urine * * * were not performed in violation of his Fourth and Fourteenth Amendment protections against warrantless searches of his body for those substances because he voluntarily * * * consent[ed] to provide those samples." (Doc. No. 62).

{¶5} At a September 13, 2021 pre-trial hearing, Hale moved to bifurcate the 12-point-suspension and FRA-suspension charges from the remaining charges in the indictment and have them resolved with a bench trial. The trial court granted Hale's motion and ordered that the 12-point-suspension and FRA-suspension charges would be tried before the court on September 30, 2021. At trial, Hale defended against the suspension charges by arguing that he was not actually under a 12-point suspension at the time of the September 27, 2020 incident, and that even if he was under an FRA suspension, he did not have legally sufficient notice of the suspension. Nevertheless, on November 22, 2021, the trial court found Hale guilty

both of driving under a 12-point suspension and of driving under an FRA suspension.

{¶6} As to the remaining charges, a change-of-plea hearing was held on December 6, 2021. At the hearing, Hale withdrew his previous plea of not guilty to the aggravated-vehicular-homicide charge and tendered a no-contest plea. The prosecutor entered a nolle prosequi with respect to the remaining eleven counts of the indictment. The trial court accepted Hale's no-contest plea and found him guilty. The trial court continued sentencing pending completion of a presentence investigation report.

{¶7} A sentencing hearing was held on January 12, 2022. At the hearing, the trial court sentenced Hale to 6-9 years in prison for aggravated vehicular homicide and 180 days in jail for driving under a 12-point suspension. The trial court ordered that those terms of incarceration be served concurrently. The trial court also fined Hale $100 for driving under an FRA suspension. Finally, the trial court suspended Hale's driver's license for 15 years. The trial court filed its judgment entry of sentence on January 14, 2022.

## II. Assignments of Error

{¶8} On February 11, 2022, Hale timely filed a notice of appeal. He raises the following two assignments of error for our review:

**1. The trial court violated the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio**

**Constitution's prohibition against unreasonable searches and seizures when it denied Hale's motion to suppress the blood and urine test results.**

**2. The trial court erred as a matter of law in convicting defendant for driving under a 12-point suspension under R.C. 4510.037(J), and FRA suspension under R.C. 4510.16(A), 4510.16(D)(1) because the evidence was insufficient to sustain a finding of guilt.**

### III. Discussion

**A. First Assignment of Error: Did the trial court err by denying Hale's motion to suppress evidence?**

{¶9} In his first assignment of error, Hale contends that the trial court erred by denying his suppression motion. Hale maintains that he did not voluntarily consent to provide blood and urine samples because he was misinformed regarding the consequences of withholding consent and because other coercive measures were used to obtain his consent.

**i. Suppression Motion Standard of Review**

{¶10} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.* *See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State*

*v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

### ii. The Constitutionality of Consent Searches

{¶11} Generally, warrantless searches are unreasonable, and therefore impermissible, under both the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. *State v. Ward*, 1st Dist. Hamilton No. C-160560, 2017-Ohio-8141, ¶ 13; *State v. Smith*, 73 Ohio App.3d 471, 474-475 (6th Dist.1991). However, the warrant requirement is subject to a handful of "specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507 (1967); *State v. Nickelson*, 7th Dist. Belmont No. 16 BE 0039, 2017-Ohio-7503, ¶ 15, quoting *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988). "One specifically established exception to the warrant requirement is 'a search that is conducted with consent.'" *State v. Hawkins*, 10th Dist. Franklin No. 15AP-35, 2016-Ohio-1404, ¶ 98, quoting *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, ¶ 11. "'"[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."'" *State v. Nwachukwa*, 3d Dist.

Marion No. 9-15-03, 2015-Ohio-3282, ¶ 28, quoting *State v. Aguirre*, 3d Dist. Seneca Nos. 13-11-19 and 13-11-20, 2012-Ohio-2014, ¶ 12, quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319 (1983).

**{¶12}** Whether consent was freely and voluntarily given, or whether it was the product of duress, coercion, or deception, is a question of fact to be determined from the totality of the circumstances. *See State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 99, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041 (1973).

> Factors to be considered in determining whether consent is voluntarily given include: (1) the suspect's custodial status and the length of the detention; (2) whether consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the suspect's awareness of his right to refuse consent and his status as a "newcomer to the law"; and (6) the suspect's education and intelligence.

*State v. Barnes*, 3d Dist. Marion No. 9-16-58, 2017-Ohio-7284, ¶ 10, quoting *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 23. Also relevant are "the extent and level of the defendant's cooperation" and "the defendant's belief that no incriminating evidence would be found." *State v. Morris*, 2d Dist. Clark No. 2021-CA-31, 2022-Ohio-94, ¶ 22. As the question of the voluntariness of the defendant's consent is ultimately one of fact, it is "a determination best left to the trier of fact, i.e. the court, and will not be reversed unless it is not supported by competent credible evidence." *State v. Carothers*, 5th Dist. Tuscarawas No. 2015

AP 04 0017, 2015-Ohio-4569, ¶ 30; *see State v. Gomez*, 5th Dist. Muskingum No. CT2018-0025, 2019-Ohio-481, ¶ 45 (stating that a trial court's determination of the voluntariness of a defendant's consent "will not be reversed on appeal unless clearly erroneous").

### iii. The trial court did not err by denying Hale's motion to suppress evidence.

{¶13} We begin with a review of the testimony and other evidence presented at the May 13, 2021 suppression hearing. The evidence established that Patrolman Miller responded to the scene of the crash at approximately 4:20 p.m. on September 27, 2020, not long after the collision. Patrolman Miller testified that he spoke to Hale and determined he was the at-fault driver. (May 13, 2021 Tr. at 25, 30). Patrolman Miller stated that, given the seriousness of the collision, he wanted to preserve samples of Hale's blood and urine for potential testing. (May 13, 2021 Tr. at 31-32). According to Patrolman Miller, when he was speaking with Hale at the scene of the crash, Hale did not exhibit any signs of impairment. (May 13, 2021 Tr. at 32). Patrolman Miller did not believe that he had probable cause to arrest Hale for operating his vehicle under the influence of alcohol or drugs, and he did not think he then had probable cause to obtain a search warrant for Hale's blood and urine. (May 13, 2021 Tr. at 32-33). Therefore, Patrolman Miller testified, he asked Hale whether he would accompany him to the local hospital to provide blood and urine samples. (May 13, 2021 Tr. at 30, 32-33). Patrolman Miller stated that

although Hale admitted he had smoked marijuana several days earlier, he consented to the blood draw and urine collection. (May 13, 2021 Tr. at 30-31, 33).

{¶14} Patrolman Miller testified that Hale was not under arrest when he initially consented to provide blood and urine samples. (May 13, 2021 Tr. at 34). From the time Hale first gave his consent through the time the blood and urine samples were obtained, Hale was neither placed in handcuffs nor threatened with being handcuffed. (May 13, 2021 Tr. at 34, 40, 50); (State's Suppression Hearing Ex. 6). In addition, Hale was permitted to retain his cellphone and was in contact with his father and girlfriend throughout the relevant time period. (May 13, 2021 Tr. at 34, 50); (State's Suppression Hearing Ex. 6). According to Patrolman Miller, as he and Hale were driving to pick up the blood and urine test kit before proceeding to the hospital, he and Hale did not discuss the matter of Hale's consent or whether Hale might withdraw his consent. (May 13, 2021 Tr. at 39).

{¶15} The footage from Patrolman Miller's body-worn camera, which was submitted as Exhibit 6 at the suppression hearing, reflects that Patrolman Miller and Hale approached the hospital doors at approximately 5:32 p.m. (State's Suppression Hearing Ex. 6). As Patrolman Miller and Hale walked toward the hospital doors, Hale told Patrolman Miller that he had received a text message from his girlfriend informing him that he "might have taken an Adderall last night," but that neither he nor his girlfriend could remember with certainty. (State's Suppression Hearing Ex.

6). Hale also stated that he "drank too," indicating that he "only drank a couple" and that it only took him three drinks to become intoxicated because he "never drink[s]." (State's Suppression Hearing Ex. 6). Hale asked Patrolman Miller whether the blood and urine testing would detect alcohol and Adderall, to which Patrolman Miller responded that he believed "alcohol comes out of your system pretty quickly." (State's Suppression Hearing Ex. 6).

{¶16} Upon entering the hospital, Patrolman Miller and Hale were escorted to the hospital's laboratory. There, Patrolman Miller informed Lauren Osterholt, a hospital employee assigned to conduct the blood draw, that he "has a gentleman here, he's consenting to a blood and urine." (State's Suppression Hearing Ex. 6). Hale said nothing in response to Patrolman Miller's statement. (State's Suppression Hearing Ex. 6). Osterholt then directed Patrolman Miller and Hale to a waiting area outside of the laboratory. While they were waiting, Patrolman Miller thanked Hale for "being cool about everything and consenting and helping us out and being honest." (State's Suppression Hearing Ex. 6). Hale responded genially, expressing no reservation or hesitation about consenting. (State's Suppression Hearing Ex. 6). During the approximately nine-minute period that Patrolman Miller and Hale were in the waiting area before going back to the blood-draw room, and indeed during the entirety of their time inside of the hospital, Patrolman Miller and Hale's

conversation was relaxed, friendly, and unreserved. (State's Suppression Hearing Ex. 6).

{¶17} Patrolman Miller and Hale were then directed to the blood-draw room. As they entered the room and took their seats, Hale's hands were free, and he was looking at something on his cellphone. (State's Suppression Hearing Ex. 6). Osterholt, who followed Patrolman Miller and Hale into the blood-draw room, asked Patrolman Miller for confirmation that he did not have a search warrant. Patrolman Miller confirmed that he did not have a search warrant and stated that Hale "said he's going to consent to everything, he's been absolutely fantastic." (State's Suppression Hearing Ex. 6). Hale, who continued to look at something on his cellphone, said nothing in response to this statement. (State's Suppression Hearing Ex. 6). Osterholt then presented Hale with a consent form utilized by the hospital and said, "I just need you to sign here, so this is your consent to drug/alcohol testing. * * * I just need you to sign there, ok, if you're consenting and then if you're refusing, there. * * * Consenting is the top part." (State's Suppression Hearing Ex. 6). Osterholt physically indicated where Hale would affix his signature if he was consenting and where he would affix his signature if he was refusing. (State's Suppression Hearing Ex. 6).

{¶18} The form given to Hale, which was submitted as Exhibit 1 at the suppression hearing, provided as follows:

### CONSENT TO DRUG/ALCOHOL TESTING

**I _____ consent to have blood, urine, or other body fluid collected for the purpose of testing for alcohol/drug content.**

**\* \* \***

### REFUSAL FOR DRUG/ALCOHOL TESTING

**I _____ refuse to have blood, urine, or other body fluid collected for the purpose of testing for alcohol/drug content. I understand that refusing to consent subjects me to a suspension of my driving privileges.[2]**

(Capitalization, underlining, and boldface sic.) (State's Suppression Hearing Ex. 1).

Beneath each of these sections were spaces provided for patient and hospital

employee signatures. (State's Suppression Hearing Ex. 1). After the consent and

refusal sections, the form contained a section that was titled "**ATTESTATION OF

LAW ENFORCEMENT OFFICER FOR INVOLUNTARY

DRUG/ALCOHOL TEST WITHOUT WARRANT OR COURT ORDER**."

(Capitalization and boldface sic.) (State's Suppression Hearing Ex. 1). This section,

which could be completed in the event the patient refused drug and alcohol testing,

provided that upon a law enforcement officer's certification that they had the lawful

authority to authorize a warrantless, involuntary drug or alcohol test, the hospital

would cooperate "provided that the testing complie[d] with Ohio law and d[id] not

---

[2] It is unclear why this language is contained in the hospital's consent form, especially considering that it is both an incomplete and inaccurate statement of the law.

-13-

pose an undue risk to the safety of Hospital personnel." (State's Suppression Ex. 1). This section further required the certifying law enforcement officer to acknowledge that "the Hospital is not responsible for restraining or use of force necessary to restrain and control the Patient." (State's Suppression Ex. 1).

{¶19} While Osterholt finished explaining the consent form to Hale, Hale began filling the form out in the spaces provided for consent to drug or alcohol testing. (State's Suppression Hearing Exs. 1, 6). The form remained in front of Hale as Osterholt went to sign her name to the form. (State's Suppression Hearing Ex. 6). As Osterholt was signing the consent form, Hale pulled out his cellphone and placed a phone call. (State's Suppression Hearing Ex. 6). As the phone call was going through, Osterholt directed Hale's attention back to the form so that he could sign beneath the consent section. (State's Suppression Hearing Ex. 6). Hale did not sign immediately but instead fixed his eyes on the form for approximately 20 seconds while talking on the phone. (State's Suppression Hearing Ex. 6).

{¶20} At the end of that 20-second period, Hale put his cellphone down and asked Patrolman Miller, "What happens if I refuse this?" (State's Suppression Hearing Ex. 6). Hale also asked, "Are they are going to like, I don't know, put me in jail or something?" (State's Suppression Hearing Ex. 6). Patrolman Miller responded that the results of the blood and urine testing would not be known for "a long time," thus indicating there would not be an immediate arrest if the results were

not favorable to him. (State's Suppression Hearing Ex. 6). Hale then asked Patrolman Miller, "What happens if I do refuse this? Are you just going to get it anyway?" (State's Suppression Hearing Ex. 6). Patrolman Miller replied, "I'm going to get a search warrant." (State's Suppression Hearing Ex. 6). In response, Hale shook his head, placed his pen to the form to begin signing, and said, "I don't want to deal with this shit." (State's Suppression Hearing Ex. 6).

{¶21} As Hale was signing the form, Patrolman Miller advised him, "If you want to refuse, you can refuse." (State's Suppression Hearing Ex. 6). Hale then pulled his pen back from the consent form and said, "I would like to talk to my lawyer, but I don't know how to get ahold of him." (State's Suppression Hearing Ex. 6). Shaking his head, Hale then stated, "It is what it is, right? I guess." (State's Suppression Hearing Ex. 6). In reply, Patrolman Miller reminded Hale, "It's up to you, buddy." (State's Suppression Hearing Ex. 6). Hale then asked Patrolman Miller, "What happens if I refuse, then you release me? Or?" (State's Suppression Hearing Ex. 6). Patrolman Miller responded, "I'm getting a search warrant. I'm for sure getting a search warrant." (State's Suppression Hearing Ex. 6). Hale asked whether that meant that he could leave the hospital and that Patrolman Miller would then come and get him. (State's Suppression Hearing Ex. 6). Patrolman Miller replied, "No, you're going to stay with me." (State's Suppression Hearing Ex. 6). Hale then shook and nodded his head and finished signing the consent form. (State's

Suppression Hearing Ex. 6). As he was signing, Hale stated that he was "not guilty or anything" but that he might have taken something, though neither he nor his girlfriend could recall whether he had. (State's Suppression Hearing Ex. 6). Hale then sat back and expressed that he expected that "weed and Adderall" would appear in his blood and urine. (State's Suppression Hearing Ex. 6).

**{¶22}** After he finished signing the consent form, Patrolman Miller and Hale conversed amicably for several minutes. Osterholt, who had left the blood-draw room in the interim, returned and reviewed the consent form. Osterholt observed that Hale had not noted the time of his signature. Hale remedied his oversight by writing the then-present time, 5:52 p.m., on the consent form. (State's Suppression Hearing Exs. 1, 6). Osterholt then collected the consent form from Hale and proceeded to withdraw Hale's blood. (State's Suppression Hearing Ex. 6). Thereafter, Patrolman Miller collected a urine sample from Hale without revisiting the issue of his consent. (State's Suppression Hearing Ex. 6).

**{¶23}** Regarding Hale's custodial status, Patrolman Miller testified that although Hale was eventually arrested for driving under a 12-point suspension after the blood and urine samples were collected, he was never placed under arrest for operating his vehicle under the influence of alcohol or drugs. (May 13, 2021 Tr. at 82); (*See* State's Suppression Hearing Ex. 6). However, Patrolman Miller agreed that at the moment Hale was inquiring about the consequences of refusal, Hale was

not free to leave without providing blood and urine samples. (May 13, 2021 Tr. at 79-80). Additionally, Patrolman Miller stated that he never asked Hale to submit to field sobriety testing because Hale did not display any indicators of intoxication in spite of his admissions to smoking marijuana, drinking alcohol, and possibly ingesting Adderall. (May 13, 2021 Tr. at 59-60, 81). With respect to the consent form, Patrolman Miller testified that he did not provide the consent form to the hospital, look at the form before it was handed to Hale, or review the consent form with Hale. (May 13, 2021 Tr. at 48, 78, 83). According to Patrolman Miller, he had no idea what Hale was looking at when he asked about the consequences of refusal, and Hale did not ask him or Osterholt any questions about the consent form. (May 13, 2021 Tr. at 84).

{¶24} Having reviewed the evidence submitted at the suppression hearing, we agree with the trial court that Hale's consent bore many of the hallmarks of voluntariness. Hale first gave his consent in public at the scene of the crash, rather than inside the confines of a police station interrogation room, and after willingly accompanying Patrolman Miller to the hospital, Hale reaffirmed his consent in the similarly unoppressive environment of a hospital examination room. Hale was not handcuffed at any point before the blood and urine samples were obtained, and he was allowed unrestricted use of his cellphone. Furthermore, Hale was exceedingly and persistently cooperative with both Patrolman Miller and Osterholt. He did not

repeatedly decline to consent, relenting only in the face of continued badgering on the part of Patrolman Miller. Instead, Hale initially consented at a very early stage of the investigation and never objected during any of the later occasions when Patrolman Miller mentioned that he was consenting. In addition, and related to Hale's cooperativeness, the discourse between Hale and Patrolman Miller, and between Hale and Osterholt, was at all times casual and cordial. *See Fry*, 2004-Ohio-5747, at ¶ 25 (observing that "polite and courteous" conversations between a law enforcement officer and the consenting party support a finding of voluntariness). Moreover, Hale was aware that he had the ability to withhold his consent and his statement that he wished he could contact his lawyer suggests that he was not a "newcomer to the law." And although there was no direct evidence of Hale's education and intelligence, Hale appeared to be lucid and engaged, asking meaningful questions of Patrolman Miller relevant to understanding and protecting his rights. Finally, while Hale believed that the blood and urine tests would likely reveal the presence of "weed and Adderall" in his system, by representing that he was "not guilty," Hale evidently did not expect that the test results would be incriminating.

{¶25} But notwithstanding these indicia of voluntariness, Hale argues that his consent was not freely given because he was misled or coerced into consenting. Hale points first to the hospital consent form he signed before his blood and urine

were collected. Hale alleges that his consent was tainted by the form because the form erroneously advised him that his driver's license would be suspended if he refused to consent and because it suggested that his bodily substances would be taken involuntarily and, if necessary, by force if he refused. To support his argument, Hale relies mainly on this court's opinion in *State v. Sweinhagen*, 3d Dist. Defiance No. 4-88-3, 1989 WL 138136 (Nov. 7, 1989), and on the opinion of the Eleventh District Court of Appeals in *State v. Brunty*, 11th Dist. Ashtabula No. 2014-A-0007, 2014-Ohio-4307.

{¶26} In *Sweinhagen*, Sweinhagen was taken to a local hospital for treatment after crashing his vehicle. Patrolman James Thill of the Ohio State Highway Patrol ("OSHP") proceeded to the hospital to secure statements from Sweinhagen and other witnesses. *Sweinhagen* at *1. When questioned by Patrolman Thill,

> Sweinhagen discussed his recollections of the accident and admitted to having had two beers. Thill then asked Sweinhagen if he would consent to a blood test. At the time, he was not in custody nor under arrest in any way. Rather, he was resting on a treatment bed with his wife standing at the bedside. Sweinhagen's wife asked Thill what her husband's options were. Thill instructed them that his license could be suspended for one year if the implied consent form was read to him. Sweinhagen then consented to the withdrawl [sic] of his blood for alcohol and drug testing.

*Id.* Sweinhagen moved to suppress the results of the blood test, which the trial court denied, and subsequently pleaded no contest to driving while under the influence of alcohol and failure to control. *Id.* In reversing the trial court's denial

of Sweinhagen's suppression motion, we suggested that since Sweinhagen was not under arrest at the time his consent was requested, Patrolman Thill did not have grounds under the implied-consent statute to advise Sweinhagen that his license could be suspended if he refused to consent.[3] *Id.* at *2, quoting *Fairfield v. Regner*, 23 Ohio App.3d 79, 84 (12th Dist.1985), *State v. Risner*, 55 Ohio App.2d 77, 80 (3d Dist.1977) and *State v. Szalai*, 13 Ohio Misc.2d 6 (C.C.1983), paragraph three of the syllabus. We concluded that "the giving of the consent in this case was not voluntary" because "[a]lthough the implied consent form was not read * * * the threat of license revocation was nevertheless introduced by the statements of the trooper." *Id.*

{¶27} In *Brunty*, Brunty was involved in a collision that ultimately claimed the life of one of the involved drivers. At the scene of the crash, OSHP Trooper Daniel Jesse asked Brunty whether he would voluntarily provide a blood sample. *Brunty* at ¶ 5. Brunty advised Trooper Jesse "that he would not, and he would not

---

[3] Under R.C. 4511.191(A)(2), "[a]ny person who operates a vehicle * * * shall be deemed to have given consent to a chemical test or tests of the person's whole blood, blood serum or plasma, breath, or urine to determine the alcohol, drug of abuse, controlled substance, metabolite of a controlled substance, or combination content of the person's whole blood, blood serum or plasma, breath, or urine if arrested for a violation of [R.C. 4511.19(A) or (B)], [R.C. 4511.194] or a substantially equivalent municipal ordinance, or a municipal OVI ordinance." When a person is placed under arrest for one of the offenses listed in R.C. 4511.191(A)(2), they must generally be advised both orally and in writing of the following before they may be requested to submit to chemical testing of their bodily substances: "If you refuse to take any chemical test required by law, your Ohio driving privileges will be suspended immediately, and you will have to pay a fee to have the privileges reinstated." R.C. 4511.192(A) and (B). "[A] valid arrest supported by probable cause to believe a defendant to have been operating a motor vehicle while under the influence * * * is a condition precedent to obtaining a defendant's consent to take a blood-alcohol test after reading the implied consent form." *State v. Harris*, 12th Dist. Warren No. CA2019-03-024, 2019-Ohio-4402, ¶ 14. "In the absence of a valid arrest, consent obtained after a reading of the implied consent form is considered involuntary * * *." *Id.*

submit to any testing at all." *Id.* Although Trooper Jesse had no suspicion that Brunty was under the influence of drugs or alcohol, he then advised Brunty that his blood sample would be obtained by force, if necessary. *Id.* at ¶ 5, 7 and 11. Brunty "responded he did not wish to give a sample, but he would accompany the trooper and submit to the test." *Id.* at ¶ 5. Brunty was subsequently taken to a local hospital, where his blood was withdrawn after he signed a hospital consent form. *Id.* The trial court suppressed the blood test results, concluding that Brunty's consent was not voluntary. *Id.* at ¶ 8. In affirming the trial court's grant of Brunty's suppression motion, the appellate court observed that because Trooper Jesse did not believe that Brunty was under the influence of alcohol or drugs, the involuntary-withdrawal provisions of the implied-consent statute did not apply.[4] *Id.* at ¶ 11. The court concluded that because the implied-consent statute did not apply, Trooper Jesse's advisement that Brunty's refusal would result in an involuntary and potentially forcible withdrawal of his blood had a coercive effect, thereby rendering Brunty's consent involuntary. *Id.* at ¶ 14, 17, 20 and 23.

---

[4] In certain cases, law enforcement officers may obtain a sample of a person's blood involuntarily. R.C. 4511.191(A)(5)(a). In such cases, when a law enforcement officer requests that the person submit to chemical testing, the officer "shall advise the person at the time of the arrest that if the person refuses to take a chemical test the officer may employ whatever reasonable means are necessary to ensure that the person submits to a chemical test of the person's whole blood or blood serum or plasma." *Id.* However, the availability of this procedure is predicated on a valid arrest for one of the qualifying offenses listed in R.C. 4511.191(A)(5)(a). Thus, R.C. 4511.191(A)(5)(a) can be invoked only where the law enforcement officer had an objectively reasonable basis to conclude that the person was under the influence of alcohol or drugs at the time they operated or physically controlled their vehicle. *See Brunty*, 2014-Ohio-4307, at ¶ 11, citing R.C. 4511.191(A)(3).

{¶28} Here, as in *Sweinhagen* and *Brunty*, the implied-consent statute did not apply. At the time his consent was requested and obtained, Hale was not under arrest for operating his vehicle while under the influence of alcohol or drugs. Therefore, Hale's refusal could not have resulted in the suspension of his driver's license or the involuntary withdrawal of his blood. But the instant case is otherwise distinguishable from *Sweinhagen* and *Brunty*. The defendants in *Sweinhagen* and *Brunty* were specifically, albeit erroneously, admonished by law enforcement officers regarding the consequences of their refusal to submit to chemical testing. By contrast, Patrolman Miller made no such statements to Hale. The fact Hale reviewed the hospital's consent form with erroneous information is of no consequence. Hale's signature on this form was requested by hospital staff, not law enforcement. Importantly, Patrolman Miller stated he was unaware of the content of the consent form. Furthermore, Hale did not ask Patrolman Miller or Osterholt any questions about the form and neither individual read the form to Hale or reviewed it with him. Accordingly, we conclude that the hospital's use of this form did not impact the voluntariness of Hale's consent.

{¶29} Hale further argues that his consent was involuntary because it was premised on his understanding that if he refused to provide blood and urine samples, "he would be detained * * * and a warrant would be obtained anyway." (Appellant's Brief at 10). Consent is not necessarily the product of duress or coercion simply

because it follows a law enforcement officer's statement regarding the prospects for a search warrant should consent be refused. *See State v. Marland*, 3d Dist. Logan No. 8-16-15, 2017-Ohio-4353, ¶ 27. Nor, as a corollary, is a party's consent automatically vitiated just because it was given in the wake of an officer's statement that, absent consent, the party would be detained pending the outcome of an application to obtain a search warrant. However, "threats" to apply for or obtain a search warrant, or to detain pending issuance of the warrant, are not invariably uncoercive. To differentiate tolerable search-warrant/detention threats from those that coerce consent, courts focus on the particular language employed by the law enforcement officer and on what the officer knew or believed at the time the consenting party was advised about the potential consequences of their refusal.

{¶30} "Courts have drawn distinctions where, on one hand, an officer merely says that he will attempt to obtain a search warrant or whether, on the other hand, he says he can obtain the search warrant, as if it were a foregone conclusion." *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990). A threat to *apply for* or to *attempt to obtain* a search warrant—at least where genuine and made with a good-faith belief that a warrant could issue— "is in no sense a false or overstated claim of authority * * * and might be said fairly to state the legal position of the person from whom the consent is sought." 4 Wayne R. LaFave, *Search and Seizure*, Section 8.2(c) (6th Ed.). Such statements are not coercive because they accurately

"describe what will occur in the event of a refusal." *State v. Pitts*, 186 Vt. 71, 88, 978 A.2d 14 (Vt.2009); *see People v. Gurtenstein*, 69 Cal.App.3d 441, 450 (Cal.App.1977) (statement that officer would apply for search warrant if consent refused "cannot be considered coercive since the officer was merely telling the defendant what he had a legal right to do").

**{¶31}** However, a statement that a search warrant *will be obtained* if consent is refused "may be an overstatement of authority 'by suggesting that a search is inevitable and that the withholding of consent will be futile.'" *Pitts* at 88-89, quoting *Commonwealth v. Mack*, 568 Pa. 329, 796 A.2d 967, 973 (Pa.2002) (Saylor, J., concurring); *see Dotson v. Somers*, 175 Conn. 614, 621, 402 A.2d 790 (Conn.1978) ("[T]he intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant."). "It may generally be said that a threat to *obtain* a search warrant is likely to be held to invalidate a subsequent consent if there were not then grounds upon which a warrant could issue, and likely not to affect the validity of the consent if the police then had probable cause upon which a warrant could issue." (Emphasis sic.) 4 LaFave at Section 8.2(c). With regard to the latter scenario, "[i]f in fact there were grounds for the issuance of a search warrant, then the well founded advice of a law enforcement agent that absent a consent to search a warrant can be obtained does not constitute coercion." *State v. Dunwoody*, 5th Dist. Licking No. 2004CA49, 2005-Ohio-219, ¶

19; *see United States v. Faruolo*, 506 F.2d 490, 494-495 (2d Cir.1974). "This proposition rests upon the conclusion that the 'threat' does not involve any deceit or trickery; but instead accurately informs the individual of his precise legal situation." *State v. Berg*, 2d Dist. Montgomery No. 15313, 1996 WL 562799, *3 (Oct. 4, 1996), citing Wayne R. LaFave, *Search and Seizure* (3d Ed.). But as the Second District Court of Appeals has explained,

> this requires the officer to be confident in his assessment that probable cause exists to issue a search warrant. Even if the officer has a good faith expectation that a warrant will issue, if he is wrong, he has thereby misinformed the suspect of a key fact that he relied on in giving his consent. For this reason, if an officer advises a suspect he will obtain a search warrant if consent is not given, probable cause must exist to obtain that warrant.

*State v. Clark*, 2d Dist. Montgomery No. 18314, 2000 WL 1643789, *7 (Nov. 3, 2000), citing *Berg* at *3; *see* 4 LaFave at Section 8.2(c). Hence, "[a]n officer's threat to obtain a warrant may invalidate the suspect's eventual consent if the officers lack the probable cause necessary for a search warrant." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir.2008).

{¶32} As for threats of detention, "[a] suspect's consent to search may be tainted by a threat of detention that essentially amounts to an arrest if consent is refused." *Id.* If consent follows upon a "threat that unreasonable detention, amounting to arrest, would result if consent were denied," the consent cannot be considered voluntary even if the consenting party was ultimately not subjected to

an unlawful arrest. *United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir.1980),

citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248 (1979). Conversely, if

law enforcement officers have sufficient grounds to lawfully seize the person and

they do not "misrepresent[] in some way the scope or extent of the[ir] authority * *

* preliminary to * * * issuance" of a search warrant, a detention threat will have a

negligible or null effect on the voluntariness of the consent. 4 LaFave at Section

8.2(c); *see Eidson* at 1146-1147 (where officer threatened to hold consenting party

"for as long as three days while a warrant was obtained" but had probable cause to

arrest, court "deem[ed] the coercion minimal").

{¶33} In this case, as Hale was considering whether to reaffirm or repudiate

his earlier consent, he was instructed by Patrolman Miller that, if he withdrew his

consent, a search warrant would "for sure" be issued and he would not be permitted

to leave until the warrant was obtained and samples of his blood and urine were

collected. Patrolman Miller's statements thus put Hale to a choice: he could consent

and go about his business after blood and urine samples were collected or he could

refuse and remain with Patrolman Miller until such time as the warrant was issued

and his blood and urine were obtained. Patrolman Miller's statements "tend[ed] to

undermine any salutary effect that advice of the right to refuse consent might have

had" and made it appear as though the collection of Hale's blood and urine was a

fait accompli. *United States v. Maez*, 872 F.2d 1444, 1456 (10th Cir.1989). Under

these circumstances—where Patrolman Miller unambiguously asserted that he was going to obtain a search warrant and Hale was faced with the prospect of a detention of indeterminate length—the voluntariness of Hale's consent turns on whether Patrolman Miller had probable cause to obtain a search warrant. *See State v. Lovato*, 478 P.3d 927, 933-934 (N.M.2020).

**{¶34}** "Probable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause." *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 370-371, 124 S.Ct. 795 (2003). Reduced to its simplest expression, "probable cause exists when a reasonably prudent person would believe that there is a fair probability that the place to be searched contains evidence of a crime." *State v. Voorhis*, 3d Dist. Logan No. 8-07-23, 2008-Ohio-3224, ¶ 79, citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983). "To search for evidence of a crime there must 'be a nexus * * * between the item to be seized and criminal behavior' as well as 'cause to believe that the evidence sought will aid in a particular

apprehension or conviction.'"  *Gonzales* at ¶ 18, quoting *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642 (1967).

**{¶35}** Although the trial court was never actually called upon to consider issuing a warrant for Hale's blood and urine, in connection with denying Hale's suppression motion, the trial court suggested that it would have.  Specifically, the trial court concluded that "[t]hough the officer did not have sufficient evidence to establish probable cause to arrest [Hale] for impaired driving when he arrived at the scene of the collision, during the course of his conversations with [Hale] both at the scene and at the hospital, he developed probable cause to seek such a warrant to order [Hale] to produce blood and urine samples." (Doc. No. 62).  We find no error in the trial court's conclusion.

**{¶36}** To begin, the fact that Hale caused a collision could be used as a relevant factor suggesting impairment.  *See State v. Smith*, 3d Dist. Defiance No. 4-21-10, 2022-Ohio-4687, ¶ 35.  Additionally, as the interaction between Patrolman Miller and Hale progressed, Hale identified more and more substances that he had ingested in the previous days.  When it came to the Adderall, Hale did not indicate when exactly he might have consumed it the previous evening or at what dosage.  Thus, it would have been difficult to even approximate how much of the Adderall had been eliminated from Hale's body in the intervening hours.  Finally, Hale's inability to remember whether he had taken an Adderall, after professing to drinking

a relatively small quantity of alcoholic beverages, was curious and introduced questions whether Hale was being entirely forthcoming or whether he had consumed Adderall or other substances in such large quantities as to impair his memory. On these facts, a reasonably prudent person could conclude that there was a fair chance that analysis of Hale's blood and urine would still reveal prohibited concentrations of at least Adderall in Hale's system or uncover other evidence supporting that he had been driving while intoxicated.

{¶37} Because we conclude that Patrolman Miller had probable cause for a search warrant, his statement to Hale that he would get a warrant if Hale refused consent was neither coercive nor misleading. Likewise, Patrolman Miller's statement that Hale would not be allowed to leave was not coercive because, to prevent Hale from absconding with the evanescent evidence believed to be in his blood and urine, Patrolman Miller would have been permitted to detain Hale for a reasonable period of time pending issuance of the search warrant. *See Illinois v. McArthur*, 531 U.S. 326, 334, 121 S.Ct. 946 (2001) ("We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."); *United States v. Yett*, 85 Fed.Appx. 471, 474 (6th Cir.2004) (concluding that a "seizure prior to the warrant's issuance [that] was calculated to prevent the loss of evidence and freeze

the status quo" was supported by probable cause and thus lawful). Finding no coercion or deception in Patrolman Miller's statements to Hale and considering the rest of the factors suggesting that Hale's consent was voluntary, we conclude that competent, credible evidence supports the trial court's finding that Hale freely and voluntarily consented to provide blood and urine samples. As the trial court's voluntariness finding is not clearly erroneous, we conclude that the trial court did not err by denying Hale's suppression motion.

{¶38} Hale's first assignment of error is overruled.

**B. Second Assignment of Error: Does sufficient evidence support Hale's convictions for driving under suspension, and must his conviction for first-degree felony aggravated vehicular homicide be vacated?**

{¶39} In his second assignment of error, Hale argues that insufficient evidence supports his convictions for driving under a 12-point suspension and for driving under an FRA suspension. He further claims that his conviction for first-degree felony aggravated vehicular homicide must be vacated because the prerequisite for enhancing the offense to a first-degree felony—a showing that he was driving under a suspended license at the time of the offense—is lacking.

**i. Sufficiency of the Evidence Standard of Review**

{¶40} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average

mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

**ii. Insufficient evidence supports Hale's conviction for driving under a 12-point suspension, but his other convictions are supported by sufficient evidence.**

{¶41} The evidence at the September 30, 2021 bench trial established that Hale was placed under a 12-point license suspension that ended on December 19, 2017. (Sept. 30, 2021 Tr. at 47-48); (State's Trial Exhibit 3). In order to reinstate his license upon completion of the suspension period, Hale was required to pay a reinstatement fee, successfully complete a remedial driving course, pass an examination administered under R.C. 4507.20, and give and maintain proof of financial responsibility (e.g., an SR-22 certificate of financial responsibility) for three years in accordance with R.C. 4509.45. (Sept. 30, 2021 Tr. at 49-50); (State's

Trial Ex. 3). *See* R.C. 4510.038(A)(1)-(3); R.C. 4509.45(D). By March 21, 2018, Hale had satisfied each of these requirements. (Sept. 30, 2021 Tr. at 49-50); (State's Trial Ex. 3). Although Hale's license was reinstated, he remained under a continuing obligation to maintain proof of financial responsibility until December 19, 2020. (Sept. 30, 2021 Tr. at 48-49); (State's Trial Ex. 3).

{¶42} However, on August 13, 2020, the Ohio Bureau of Motor Vehicles ("BMV") received notice that Hale's insurer had canceled his insurance. (Sept. 30, 2021 Tr. at 64); (State's Trial Ex. 3). The cancellation was not processed and made effective until 10 days later on August 23, 2020, at which time the BMV claimed Hale's "license went back under suspension." (Sept. 30, 2021 Tr. at 65); (State's Trial Ex. 3). Diane Hayward, Assistant Chief with Field Services for BMV District Four, testified that although the BMV "normally" sends a driver notice when their license goes "back under suspension" for failing to maintain proof of financial responsibility, she could find no record of any such notice being sent to Hale. (Sept. 30, 2021 Tr. at 65-66). She stated that the law does not require the BMV to issue such notices but that the BMV typically does so as a courtesy. (Sept. 30, 2021 Tr. at 66). Hayward testified that, as of September 27, 2020, Hale's license was suspended and that the suspension was an "FRA suspension, due to insurance cancellation," which was "also part of the 12 point." (Sept. 30, 2021 Tr. at 67).

Hayward agreed that Hale was "really under both, the 12 point and the FRA, and they're together." (Sept. 30, 2021 Tr. at 43).

{¶43} Patrolman Miller testified that while speaking to Hale at the scene of the crash, his dispatcher advised him that BMV records showed Hale's license was suspended. (Sept. 30, 2021 Tr. at 17). This moment was captured on Patrolman Miller's body-worn camera. In the recording, Hale overhears the dispatcher say that his license is suspended, which prompts Hale to say, "That's actually in the works, that's taken care of." (State's Trial Ex. 1). Patrolman Miller responds that it "was not taken care of yet." (State's Trial Ex. 1). Hale replies that "they said it takes 72 hours to get back on there or whatever," and he asks Patrolman Miller whether it "still counts as suspended." (State's Trial Ex. 1). Patrolman Miller responds that it did still count as suspended. (State's Trial Ex. 1).

{¶44} On this evidence, Hale was convicted of driving under a 12-point suspension and driving under an FRA suspension. These convictions were also used to enhance his aggravated-vehicular-homicide conviction to a first-degree felony. We address the sufficiency of the evidence supporting each of these convictions in turn.

{¶45} Hale was convicted of driving under a 12-point suspension in violation of R.C. 4510.037(J), which provides that "[a]ny person whose driver's * * * license * * * [is] suspended as a repeat traffic offender under [R.C. 4510.037] and who,

during the suspension, operates any motor vehicle upon any public roads and highways is guilty of driving under a twelve-point suspension * * *." When Hale received his 12-point suspension from the BMV in 2017, his license was required to be suspended for a definite period of six months pursuant to R.C. 4510.037 and R.C. 4510.02(B)(4). A six-month driver's license suspension imposed under these statutes is terminated by operation of law upon the completion of that six-month period. *State v. Roberts*, 62 Ohio St.2d 94 (1980), syllabus.[5] Compliance with the reinstatement requirements of R.C. 4510.038(A)(1)-(3) is not the event that terminates a 12-point suspension. *See id.* at 96. Here, as previously stated, Hale completed his 12-point suspension on December 19, 2017. Thus, Hale's 12-point suspension terminated by operation of law on that date. Hale's operation of his vehicle after failing to maintain proof of insurance—a continuing condition for the reinstatement of his driver's license—might constitute an offense, but his failure to maintain proof of insurance did not reanimate his 12-point suspension such that he could be convicted of driving under a 12-point suspension. *See id.* at 94-96; *State v. Angelo*, 5th Dist. Muskingum No. CT2018-0044, 2019-Ohio-422, ¶ 6 and 11-13; *State v. Gasser*, 29 Ohio App.3d 115, 116-117 (9th Dist.1985). Accordingly, we

---

[5] Although they have been recodified, reorganized, and amended since *Roberts*, the statutory provisions upon which the conclusion in *Roberts* was premised still exist in substantially identical form. *See* R.C. 4510.037(B) and (I), 4510.02(B)(4), and 4510.038(A)(1)-(3).

conclude that Hale's conviction for driving under a 12-point suspension is not supported by sufficient evidence.

**{¶46}** Hale was also convicted of driving under an FRA suspension in violation of R.C. 4510.16(A), which provides in relevant part that "[n]o person, whose driver's * * * license * * * has been suspended or canceled pursuant to Chapter 4509. of the Revised Code, shall operate any motor vehicle within this state * * * during the period of the suspension or cancellation, except as specifically authorized by Chapter 4509. of the Revised Code." From Hayward's testimony and the documentary evidence, it is somewhat unclear which section of R.C. Chapter 4509 the BMV purported to rely on as authority for suspending Hale's license after his insurance was canceled. Nevertheless, we note that under R.C. 4509.66, "[w]henever any proof of financial responsibility filed under sections 4509.01 to 4509.78, inclusive, of the Revised Code, no longer fulfills the purposes for which required, the registrar of motor vehicles shall require other proof and shall suspend the license and registration or the nonresident's operating privilege pending the filing of such other proof."

**{¶47}** It is undisputed that Hale's insurance was canceled effective August 23, 2020. Thus, as of that date, Hale's proof of financial responsibility "no longer fulfill[ed] the purposes for which [it was] required," and the BMV was empowered to suspend Hale's driver's license for that reason. *See Glinsek v. Ohio Bur. of Motor*

*Vehicles*, 9th Dist. Summit No. 13657, 1988 WL 139604, *1-2 (Dec. 28, 1988) (concluding that the BMV did not err by suspending driver's license under R.C. 4509.66 where the BMV required proof of financial responsibility after an accident and "BMV deemed that the unsigned declaration page of [the] insurance policy [was] inadequate proof of coverage"); *Brisker v. Ibrahim*, 29 Ohio App.3d 16, 17 (8th Dist.1985), fn. 2 (suggesting that the BMV could have suspended a driver's license under R.C. 4509.66 after driver, whose license had been reinstated following a suspension for his "unsafe driving record," had his insurance policy canceled). As Hale had not satisfactorily remedied his insurance lapse by September 27, 2020, this suspension remained in effect. Furthermore, construing Hale's crash-scene statements to Patrolman Miller in a light most favorable to the State, there is sufficient evidence that Hale was aware that his license had been suspended and that he needed to obtain new insurance. Consequently, we conclude that Hale's conviction for driving under FRA suspension in violation of R.C. 4510.16(A) is supported by sufficient evidence. And as sufficient evidence supports Hale's conviction for driving under an FRA suspension, there is necessarily sufficient evidentiary support for enhancing Hale's aggravated vehicular homicide offense to a first-degree felony.

**{¶48}** Hale's second assignment of error is sustained in part and overruled in part.

## IV. Conclusion

{¶49} Having found error prejudicial to Hale with respect to his conviction for driving under a 12-point suspension, we reverse the judgment of the Mercer County Court of Common Pleas with respect to that conviction and remand for further proceedings consistent with this opinion.  In all other respects, we affirm.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**